HUGHES, ET AL. *v.* MARYLAND COMMITTEE FOR FAIR REPRESENTATION, ET AL.

[No. 487, September Term, 1965.]

*Decided, per curiam, January 11, 1966.*

*Opinions filed March 2, 1966.*

*Lawrence F. Rodowsky* and *George W. Liebmann,* with whom were *Frank, Bernstein, Conaway, Gump & Kaufman* on the brief, for appellants.

Amicus curiae brief filed by John Norton Johnson. Herbert M. Brune on the brief.

*Thomas B. Finan, Attorney General,* with whom was *Robert F. Sweeney, Assistant Attorney General,* on the brief, for Attorney General of Maryland, part of appellees; *Alfred L. Scanlan,* with whom were *Johnson Bowie, John B. Wright, Francis X. Gallagher* and *Shea & Gardner* on the brief, for other appellees.

PRESCOTT, C. J., delivered the opinion of the Court. HORNEY and BARNES, JJ., dissent. Dissenting opinion by BARNES, J., in which HORNEY, J., concurs, at page 491, *infra.*

The importance of the result of our *per curiam* order herein, where a majority of the Court affirmed the holdings of the trial judge, would justify an opinion of very considerable length setting forth the reasons therefor. However, such a course is not necessary or desirable, and will not be followed. Although the subject of apportionment of State Legislatures has seemingly been the subject of more legal opinions [1] and law review articles [2] than any other single legal theme since the decision in

---

1. Within nine months after Baker v. Carr, infra, litigation relative to apportionment had been begun in some 34 States.

2. They run anywhere from "Courts in the Thicket," Hanson, 12 Amer. U. L. Rev. 51, to "Political Thickets and Crazy Quilts: etc.," McKay, 61 Mich. L. Rev. 645.

*Baker v. Carr,* 369 U. S. 186 (1962) wherein the Supreme Court decided to place the apportionment of State Legislatures under the supervision of the Federal (as well as the State) Courts, the Supreme Court, which is the ultimate interpreter of the United States Constitution, has, itself, spoken in plain terms on the question presently involved. Hence, if we analyze the great number of state and lower federal court decisions, as well as the numerous law review articles, it would simply result in useless repetition and consumption of space, for all of them aim at trying to discover what the Supreme Court has said, and probably will say, on the subject. The answers to the questions herein involved are contained in the Supreme Court's opinions in the appeal in this case, *Maryland Committee, etc., v. Tawes,* 377 U. S. 656, and *Reynolds v. Sims,* 377 U. S. 533.

Two questions are presented: (1), Does Senate Bill 8 of the Acts of Assembly, Extraordinary Session 1965, constitutionally apportion the membership of the State Senate; and (2), If it does not, is Senate Bill 5 free of constitutional infirmity, because it apportions the membership of both the State Senate and the House of Delegates in a constitutionally permissible manner?

We set forth here a bare outline of the history of the case, because a detailed account thereof may be found in our two previous opinions (228 Md. 412 and 229 Md. 406) and the opinion of the Supreme Court on appeal thereto (377 U. S. 656). (There is a slight typographical error on page 663 where the opinion states this Court split 5-to-3 on its decision. The split was 4-to-3.)

The case originated in 1960 by a bill of complaint filed in the Circuit Court for Anne Arundel County. The plaintiffs alleged that the apportionment of the General Assembly, pursuant to Article III, §§ 2 and 5, of the Maryland Constitution, discriminated against them as inhabitants and voters in the more populous areas of the State, by according them substantially less representation than that given to persons residing and voting in less populous areas. They requested declaratory and injunctive relief. In February, 1961, the trial court sustained defendants' demurrers and dismissed the bill. In April of 1962, we reversed (splitting 5-to-2) and remanded. (228 Md. 412.) On May 24, 1962, the trial court held that the House of Delegates was un-

constitutionally apportioned, but made no finding with reference to the Senate. The Legislature, called into special session by the Governor in May, 1962, enacted stop-gap legislation allocating 19 additional seats in the House of Delegates to the more populous areas of the State.

As the trial court made no ruling with reference to the apportionment of the Senate, the plaintiffs appealed to this Court. On June 8, 1962, we remanded for a decision on the question. The trial judge concluded that the Senate was constitutionally constituted, and the plaintiffs, again, appealed. This Court, splitting 4-to-3, affirmed. The plaintiffs appealed to the Supreme Court, where the holding was reversed, the Supreme Court holding that the apportionment of both the House of Delegates and the Senate was invidiously discriminatory and, therefore, unconstitutional and illegal. In compliance with the mandate from the Supreme Court, we remanded the case to the trial court with directions to retain jurisdiction and to take affirmative action upon application of any of the parties in the event that the Legislature failed to enact a constitutionally valid apportionment scheme prior to the 1966 primary elections.

At its regular 1965 session, the Legislature passed no reapportionment legislation. As a result thereof, the Governor convened a special session for the purpose of complying with the Supreme Court's mandate that such legislation must be enacted. Senate Bills 5 and 8 resulted. Senate Bill 8 contains an unusual provision stating that if it "be declared valid by the Court of Appeals of Maryland," then Senate Bill 5 "shall not become effective." The purpose of this provision is, of course, to obtain for the less populous areas the more favorable representation afforded them by Senate Bill 8, if constitutionally permissible. The Governor signed both Bills, after publicly announcing that he thought Senate Bill 8 unconstitutional, but that the Legislature was entitled to have the Court of Appeals pass upon that question first, if the Legislature so desired. This is the posture of the case as it reaches us at this time.

As previously indicated, we find it unnecessary, under the facts here presented, to set forth, elaborately, the applicable law. Although recognizing the impracticability of apportioning on the basis of an exact mathematical formula, in both the ap-

peal in this case and in *Sims, supra,* the Supreme Court held, flatly, that each body of a bicameral state legislature must be apportioned *primarily* on a population consideration. In addition to this holding, the opinion in *Sims,* obligingly, went on to advise as to what probably would, and what probably would not, be constitutionally permissible under certain named circumstances. We quote pertinent excerpts therefrom:

"* * * *Wesberry* clearly established that the fundamental principle of representative government in this country is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State."

* * *

"Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests."

* * *

"Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race, * * *."

* * *

"And, if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted. It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voters could vote two, five, or 10 times for their legislative representatives, while voters living elsewhere could vote only once. And it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five, or 10, while the votes of persons in another area would be counted only at face value,

could be constitutionally sustainable. Of course, the effect of state legislative districting schemes which give the same number of representatives to unequal numbers of constituents is identical."

\* \* \*

"While the result of a court decision in a state legislative apportionment controversy may be to require the restructuring of the geographical distribution of seats in a state legislature, the judicial focus must be concentrated upon ascertaining whether there has been any discrimination against certain of the State's citizens which constitutes an impermissible impairment of their constitutionally protected right to vote."

\* \* \*

"But the basic principle of representative government remains, and must remain, unchanged — the weight of a citizen's vote cannot be made to depend on where he lives. Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies."

\* \* \*

"Logically, in a society ostensibly grounded on representative government, it would seem reasonable that a majority of the people of a State could elect a majority of that State's legislators. To conclude differently, and to sanction minority control of state legislative bodies, would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result."

\* \* \*

"We are told that the matter of apportioning representation in a state legislature is a complex and many-faceted one. We are advised that States can rationally consider factors other than population in apportioning legislative representation. We are admonished not to restrict the power of the States to im-

pose differing views as to political philosophy on their citizens. We are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us."

I

Senate Bill 8 provides for a 53-member Senate, to be elected from 29 senatorial districts (with a further provision relative to "subdistricts," not necessary to be considered in detail). One seat is allocated to each of 19 counties (Maryland, of course, has but 23), and the balance are allocated to the other (more populous) counties and the Legislative Districts of Baltimore City. It takes no more than a cursory examination of the Bill to see that its underlying scheme, glaringly, falls far short of the requisites laid down by the Supreme Court to render the provisions of a state apportionment measure constitutionally permissible.

Under the Bill, each district or subdistrict would elect at least 1 Senator. It will be unnecessary to state all of the disparities in population ratios in all of the districts and subdistricts; some of them follow. Kent and Calvert Counties, each with a population of about 15,000 souls (population will sometimes be referred to herein in even thousands), are given 1 senator apiece, while 17 other counties, with larger populations, some with populations as high as 84,000 (Allegany) and 91,000 (Washington), are also only allocated 1 senator each.[3] A simple arithmetical calculation shows the disparity in individual voting effectiveness to range to a ratio of just about 6 to 1. Baltimore City, with a population of 939,000 is allotted 12 senators; Baltimore County, with a population of 492,000, 7 senators; and Prince George's County, with a population of 357,000, 6 senators. Taking 15,000, the population of Calvert and Kent Counties, as a basis for calculation, it is seen that the votes of

---

3. The populations of the counties and Baltimore City are stated in the appendices 1, 2 and 3 filed herewith. See also Appendix A and Appendix B on pp. 429 and 430 of 229 Md. These appendices show in detail the various disparities.

the people of Baltimore City, when compared with the votes of the people of those counties, are debased or diluted more than 5 to 1; the votes of the people of Baltimore County by over 4½ to 1; and the votes of the inhabitants of Prince George's County nearly 4 to 1.

Additionally, it should be noted that under the scheme of the Bill some 37% of the State's population would elect a majority of 27 senators.[3a] Also, it is significant that very few of the 29 Districts would involve a variance of less than 15% (a figure that some courts consider to be about the top variance allowable, except under very unusual circumstances, or necessary, in a few instances, to round off an otherwise rational state apportionment scheme), although some of the variances would range to about 74%.

A reading of the above facts discloses that Senate Bill 8 transgresses and runs counter to nearly, if not, all of the mandates contained in the excerpts we have quoted from *Sims*. It is not based, primarily, on a population scheme; on the contrary, it is patently based upon geographical consideration, with county lines forming the boundaries, for the main part, of the Senatorial Districts, and the Districts, as proposed, would without peradventure of doubt, discriminate against large segments of the citizens of the State in their "constitutionally protected right to vote" without those votes being diluted. It, possibly, would permit considerably less than a majority of the population to elect a majority of the Senators. It definitely and obviously makes the weight of the citizens' votes "depend on where [they] live," and this "weight" is shown to vary nearly to the ratio of 6 to 1.

However, counsel for the appellants, with commendable zeal [4]

---

3a. Appendix 3 shows that Somerset, Kent, Caroline, Queen Anne's, Talbot, Dorchester, Wicomico, Worcester, Cecil, Calvert, St. Mary's, Charles, Howard, Carroll and Garrett would each elect 1 Senator for a total of 15; Montgomery and Prince George's 12 for a total of 27 Senators.

The combined population of these counties is 1,138,563; which is 36.7% of the total population of 3,100,689.

4. Counsel for appellants advanced, with ability and skill, every seemingly possible argument favorable to their clients, and counsel for the other parties did likewise. The Attorney General points

and at great length, have urged upon us that the disparities mentioned above are constitutionally permissible because of the large amount of local legislation considered by the members of the General Assembly, and the important role in Maryland played by its counties. We concede the postulates of this argument, and, in answering the same, would discuss and consider them at greater length, were it not for the fact that the Supreme Court has already answered the same, and its rulings upon the Federal Constitution are binding, not only upon us, but upon all of the Courts in this Nation. In *Sims,* at p. 578 of 377 U. S., the Chief Justice, for the Court, stated:

> "Since, almost invariably, there is a significantly larger number of seats in state legislative bodies to be distributed within a State than congressional seats, it may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting while still affording adequate representation to all parts of the State. To do so would be constitutionally valid, *so long as the resulting apportionment was one based substantially on population and the equal-population principle was not diluted in any significant way."*

From our statement above of the provisions of the Bill, wherein the county lines are predominantly utilized for political subdivision purposes and the weight of citizens' votes are debased to a rate of 1 to 6, can it be seriously contended the Bill "Still afford[s] adequate representation to all parts of the State," or that the apportionment is one based *substantially* on population, and "the equal population principle [has not been] diluted in any significant way"? We think not. The figures themselves

---

to his rather unusual role in not defending the constitutionality of a legislative enactment. We know of no reason why the Attorney General, or any other lawyer, should stultify himself by arguing to the Court contrary to his honest beliefs. He would have been in a most anomolous situation, after advising the Legislature that Senate Bill 8 was unconstitutional, if he argued here that it was. In our judgment, the Attorney General and his staff who assisted him conducted themselves with proper decorum as officers of this Court.

show, to the point of mathematical demonstration, that the equal-population principle is attempted to be diluted to such an extent that the Bill has little resemblance to constitutional permissibility. In our judgment, the Bill attempts to "dilute" the equal-population rule to a point where we know of no ready "condiment" that would quickly restore its constitutional "flavor."

The Court, again, at page 580, recognizes that "some deviations from population-based representation" may be allowable in order to insure "some voice" to political subdivisions as political subdivisions, "as long as the basic standard of equality of population *among districts is maintained."* (Emphasis ours.) Finishing the paragraph, the Court concluded:

> "But if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, *population is submerged as the controlling consideration* in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired." (Emphasis again ours.)

The Court had already stated, as quoted above, "* * * if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part * * *, it could hardly be contended that the right to vote of those residing in the disfavored areas *had not been effectively diluted."* (Emphasis added.) This portion of the opinion makes clear what that Court meant when it used the phrase "population is submerged as the controlling consideration." With the disparity in the instant case ranging to some 6 to 1, we have no hesitancy in holding that population is submerged as the controlling consideration in Senate Bill 8, and its overall provisions render it constitutionally impermissible.

The Supreme Court, in *Sims,* clearly stated that, in considering the constitutional composition of a bicameral legislature, the make-up of both branches should be considered together, for it is possible that the composition of one body of such a legis-

lature might prevent some deviation in the other body from being constitutionally impermissible, which would be impermissible if the composition of that body were considered alone. We have considered Senate Bill 8 in this light. It and Senate Bill 5 have identical provisions relative to the apportionment of the House of Delegates. We find nothing in the apportionment of the House, as we will explain it below, which would remedy the constitutional pitfalls of Senate Bill 8.

If we entertained any doubts whatever that our above holding is not directed and impelled by the decisions in *Sims, supra,* and the appeal of this case to the Supreme Court, they would be quickly dispelled by a reading of any one of three cases decided by that Court on the same day as *Sims* and the appeal herein: *WMCA, Inc. v. Lomenzo,* 377 U. S. 633, where New York's apportionment of both Houses was declared invalid; *Davis v. Mann,* 377 U. S. 678, which struck down Virginia's apportionment—variances in the House ranging to 4.36 to 1, in the Senate to 2.65 to 1; and *Lucas v. Colorado General Assembly,* 377 U. S. 713, which dealt likewise with Colorado's apportionment where the disparities in the Senate ranged to 3.6 to 1, and in the House 1.7 to 1.

Appellants' final contention is that the Bill should be sustained as a valid stop-gap measure. The short but complete answer to this is the Supreme Court's command in its remand of the case to this Court: "However, under no circumstances should the 1966 election of members of the Maryland Legislature be permitted to be conducted pursuant to the existing or any other unconstitutional plan." 377 U. S. at p. 676.

II

We turn to Senate Bill 5. None of the parties hereto contests its validity; however, in view of the mandate of the Supreme Court, mentioned above, we deem it appropriate to pass upon its validity.

This Bill presents a different picture from Bill 8. An analysis of Bill 5 discloses an underlying scheme of apportionment of each branch of the Maryland Legislature based primarily on the population of the State's residents. We consider first the provisions relative to membership of the Senate.

The State is divided into 16 Senatorial Districts from which 43 Senators will be elected; 3 from District 1, comprising Garrett, Allegany and Washington Counties; 2 from District 2, Frederick and Carroll Counties; 5 from District 3, Montgomery and Howard Counties; 5 from District 4, Prince George's County; 1 from District 5, Charles and St. Mary's Counties; 3 from District 6, Anne Arundel and Calvert Counties; 2 each from Districts 7-12 (the Legislative Districts of Baltimore City); 7 from District 13, Baltimore County; 1 from District 14, Harford County; 2 from District 15, Cecil, Kent, Queen Anne's, Caroline and Talbott Counties; and 2 from District 16, Dorchester, Wicomico, Worcester, and Somerset Counties. The bill provides for subdistricting any district entitled to elect more than 2 Senators.

Looking at the Bill in the light the Supreme Court has said that we must, i.e., placing the "judicial focus" on "the overall representation accorded to the State's voter," we find from Appendix 2 the following. The State's population (1960 census) is 3,100,689, which divided by 43 gives a mathematical unit of senatorial population of 72,109. The least percentage of the State's population which can elect a majority of 22 Senators will be 47.8. The Supreme Court, in one of the excerpts from *Sims* above, stated that it was not too much to expect from a proper apportionment that a majority of the voters be required in order to elect a majority of the members of a legislature. However, the Court recognized that its suggested guidelines set forth therein were not inflexible, and, under warranted circumstances, they might yield slightly in order to accommodate and accomplish a rational state policy of apportionment. The rather small discrepancy here is not sufficient, we think, to destroy the validity of the reasonable and well thought-out apportionment of the members of the Senate.

Further, in no District is one voter's vote raised or diluted to a ratio of as much as 2 to 1. On the contrary, in only 4 of the 16 Districts does the population-per-senator figure vary more than 15% from the mathematical population norm,[5] and

---

5. The Supreme Court has not set an exact mathematical ratio, which will be constitutionally permissible or impermissible, and neither has any other Court to our knowledge. However, as we

these exceed the 15% by small margins only (two of these are Legislative Districts in Baltimore City, whose overall variance is but 8.5%). And in 7 of the Districts the variance is less than 7%.

Although these comparatively small disparities exist, they are to be expected in nearly any rational overall State policy in reapportioning its Assembly, and they indicate no ulterior motives, for the Districts follow the boundaries of the present political subdivisions. The following of the existing boundaries, in and of itself, has certain distinct advantages, among them being the handling of voting machinery, its facility in conducting elections, and the less likelihood of any attempt at gerrymandering.

We hold that this Bill is an honest State effort to apportion the Senate on a population basis, and the small inequalities in voting strength mentioned above result from a good-faith attempt to effectuate a rational State policy, and that they are within the limitations set by the Supreme Court as being Constitutionally permissible.

We turn now to the apportionment of the House of Delegates. Senate Bill 5 provides for a membership of 142 Delegates. Each county of the State and Baltimore City is allocated a minimum of 1 Delegate, accounting for 24 members. The remaining 118 seats are apportioned among the counties and Baltimore City according to the mathematical formula of equal proportions. The formula is applied by dividing the population of each county and the City, separately, by the geometrical mean between the numerals 1 and 2, 2 and 3, 3 and 4, and continuing in the progression so long as necessary to complete the computation. The resulting quotients for the House of Delegates are then arranged in order of numerical size, from the largest to the smallest, and the first 118 listings are given as additional memberships to the particular county or to Baltimore City. The

---

stated above, some Courts have adopted as a rule of thumb that a variance of over 15% from the population norm would be constitutionally suspect, while any lesser discrepancy would, under ordinary circumstances, probably be constitutionally permissible. Toombs v. Fortson, 241 F. Supp. 65 (1965) (D. C., N. D. Ga.); Silver v. Brown, 405 P. 2d 132 (Sup. Ct. Cal. In Bank).

Delegates thus allotted to the City are apportioned in the same manner and allocated to the several Legislative Districts thereof. The result of this "more or less fancy" mathematical calculation in apportioning the Delegates is shown, according to the parties, on Appendix 3.

The Bill also makes provision for dividing the counties and the City into districts, based on population, in the event any county is awarded more than 8 Delegates, or the City more than 48. It also provides for continuing its provisions in the elections after the year 1970, on the bases of federal decennial censuses. It is unnecessary to discuss the details of these provisions here.

An examination of Appendix 3 reveals that the mathematical unit of delegate population is 21,836. Each county obtains at least 1 member. Of the 142 seats, 132 will be elected by populations with variances less than 15% of the mathematical norm. The highest variance in the 10 seats which exceed 15% is one seat which ranges to 36%, but none of them reaches a disparity as great as 2 to 1. According to the decisions, 36% is, of course, high. However, as we stated above, the Supreme Court has recognized that some divergences from population-based representation are permissible, so long as they are the result of legitimate considerations incident to the effectuation of a rational state policy, based principally upon population. *Reynolds v. Sims, supra; Roman v. Sincock,* 377 U. S. 695. Compare *Lucas v. Colorado General Assembly, supra,* 377 U. S. 713. The parties to this appeal and the counsel who represent them have, for the main part, been vitally interested, for the last several years, in matters pertaining to apportionment, and have made careful studies of the decisions and writings thereon. They all agree that Bill 5 is constitutionally permissible. In light of the above and our own careful consideration of the matter, we are unwilling to strike down the Bill for the comparatively few "suspect" variances, which, in our view, clearly result from an earnest effort to accomplish a reasonable statewide apportionment, and, at the same time, accord some slight independent representation to individual, existing political subdivisions.

It will be noted that the 19 least populous counties and the

First, Third, Fourth, Fifth and Sixth Legislative Districts of Baltimore City, with 49.5% of the State's population will elect 71 Delegates, constituting 50% of the membership and the remaining political subdivisions, with 50.5% will also elect 71 members. A further analysis of Appendix 3 discloses that 5 subdivisions, having 75.3% of the population, will select 106 Delegates, or 74.7% of the membership, while the remaining subdivisions, with 24.7% of the population will elect 36 members, constituting 25.3% of the total membership. To us, this demonstrates an honest and sincere apportionment, founded, primarily and principally, upon population.

We hold that Senate Bill 5 is constitutionally sustainable, and that it does not violate either the State or Federal Constitutions.

The above are the reasons that the majority passed the *per curiam* order herein.

> *The majority previously directed a per curiam order sustaining the order of the trial court. We add to that order that the trial court retain jurisdiction at least until after the 1966 General Elections; and that appellants pay the costs.*

# APPENDIX 1

REAPPORTIONMENT OF SENATE

53 MEMBERS (SENATE BILL 8)

| Senatorial District | County | 1960 Census | No. of Senators | Pop. per Senator | % Variance Unit of Population |
|---|---|---|---|---|---|
| 1 | Garrett | 20,420 | 1 | 20,420 | —65 |
| 2 | Allegany | 84,169 | 1 | 84,169 | +44 |
| 3 | Washington | 91,219 | 1 | 91,219 | +56 |
| 4 | Frederick | 71,930 | 1 | 71,930 | +23 |
| 5 | Carroll | 52,785 | 1 | 52,785 | —10 |
| 6 | Howard | 36,152 | 1 | 36,152 | —38 |
| 7 | Montgomery | 340,928 | 6 | 56,821 | — 3 |
| 8 | Prince George's | 357,395 | 6 | 59,566 | + 2 |
| 9 | Charles | 32,572 | 1 | 32,572 | —44 |
| 10 | St. Mary's | 38,915 | 1 | 38,915 | —34 |
| 11 | Calvert | 15,826 | 1 | 15,826 | —73 |
| 12 | Anne Arundel | 206,634 | 3 | 68,878 | +18 |
|  | Baltimore City: |  |  |  |  |
| 13 | District No. 1 | 126,611 | 2 | 63,306 | + 8 |
| 14 | 2 | 166,057 | 2 | 83,029 | +42 |
| 15 | 3 | 170,414 | 2 | 85,207 | +46 |
| 16 | 4 | 199,385 | 2 | 79,693 | +36 |
| 17 | 5 | 162,437 | 2 | 81,219 | +39 |
| 18 | 6 | 154,120 | 2 | 77,060 | +32 |
| 19 | Baltimore | 492,428 | 7 | 70,347 | +20 |
| 20 | Harford | 76,722 | 1 | 76,722 | +31 |
| 21 | Cecil | 48,408 | 1 | 48,408 | —17 |
| 22 | Kent | 15,481 | 1 | 15,481 | —74 |
| 23 | Caroline | 19,462 | 1 | 19,462 | —67 |
| 24 | Queen Anne's | 16,569 | 1 | 16,569 | —72 |
| 25 | Talbot | 21,578 | 1 | 21,578 | —63 |
| 26 | Dorchester | 29,666 | 1 | 29,666 | —49 |
| 27 | Wicomico | 49,050 | 1 | 49,050 | —16 |
| 28 | Worcester | 23,733 | 1 | 23,733 | —59 |
| 29 | Somerset | 19,623 | 1 | 19,623 | —67 |
|  |  | 3,100,689 | 53 |  |  |

1 Unit of Population is 58,504    (+15% = 67,280    —15% = 49,728)

# APPENDIX 2

## SENATE BILL 5—THIRD READING COPY

### SENATOR JAMES PLAN FOR REAPPORTIONMENT OF SENATE WITH 43 MEMBERS

| County | 1960 Census | No. of Senators | Pop. per Senator | % Variance —Unit of Population |
|---|---|---|---|---|
| Garrett, Allegany, Washington | 195,808 | 3 | 65,269 | — 9.5 |
| Frederick,  Carroll | 124,715 | 2 | 62,358 | —13.5 |
| Montgomery,  Howard | 377,080 | 5 | 75,416 | + 4.6 |
| Prince George's | 357,395 | 5 | 71,479 | — 0.9 |
| Charles, St. Mary's | 71,487 | 1 | 71,487 | — 0.9 |
| Anne Arundel, Calvert | 222,460 | 3 | 74,153 | + 2.8 |
| Baltimore City: | (939,024) | (12) | (78,252) | (+ 8.5) |
| District No. 1 | 126,611 | 2 | 63,306 | —12.2 |
| District No. 2 | 166,057 | 2 | 83,029 | +15.1 |
| District No. 3 | 170,414 | 2 | 85,207 | +18.2 |
| District No. 4 | 159,385 | 2 | 79,693 | +10.5 |
| District No. 5 | 162,437 | 2 | 81,219 | +12.6 |
| District No. 6 | 154,120 | 2 | 77,060 | + 6.9 |
| Baltimore  County | 492,428 | 7 | 70,347 | — 2.4 |
| Harford | 76,722 | 1 | 76,722 | + 6.4 |
| Cecil, Kent, Queen Anne's, Caroline & Talbot | 121,498 | 2 | 60,749 | —15.8 |
| Dorchester, Wicomico, Worcester & Somerset | 122,072 | 2 | 61,036 | —15.4 |
| | 3,100,689 | 43 | | |

1 Unit of Population is 72,109     (+15% = 82,925       —15% = 61,293)

# APPENDIX 3

REAPPORTIONMENT OF HOUSE OF DELEGATES
142 MEMBERS BY MATHEMATICAL FORMULA OF
EQUAL PROPORTIONS (SENATE BILLS 5 AND 8)

| County | 1960 Census | No. of Delegates | Pop. per Delegate | % Variance Unit of Population |
|---|---|---|---|---|
| Allegany | 84,169 | 4 | 21,042 | — 4 |
| Anne Arundel | 206,634 | 9 | 22,959 | + 5 |
| Baltimore | 492,428 | 22 | 22,383 | + 3 |
| Baltimore City: | | | | |
| District No. 1 | 126,611 | 6 | 21,102 | — 3 |
| District No. 2 | 169,308 | 8 | 21,164 | — 3 |
| District No. 3 | 167,163 | 8 | 20,895 | — 4 |
| District No. 4 | 159,385 | 7 | 22,769 | + 4 |
| District No. 5 | 162,437 | 7 | 23,205 | + 6 |
| District No. 6 | 154,120 | 7 | 22,017 | + 1 |
| Calvert | 15,826 | 1 | 15,826 | —28 |
| Caroline | 19,462 | 1 | 19,462 | —11 |
| Carroll | 52,785 | 2 | 26,393 | +21 |
| Cecil | 48,408 | 2 | 24,204 | +11 |
| Charles | 32,572 | 2 | 16,286 | —25 |
| Dorchester | 29,666 | 1 | 29,666 | +36 |
| Frederick | 71,930 | 3 | 23,977 | +10 |
| Garrett | 20,420 | 1 | 20,420 | — 7 |
| Harford | 76,722 | 4 | 19,181 | —12 |
| Howard | 36,152 | 2 | 18,076 | —17 |
| Kent | 15,481 | 1 | 15,481 | —20 |
| Montgomery | 340,928 | 16 | 21,308 | — 2 |
| Prince George's | 357,395 | 16 | 22,337 | + 2 |
| Queen Anne's | 16,569 | 1 | 16,569 | —24 |
| St. Mary's | 38,915 | 2 | 19,458 | —11 |
| Somerset | 19,623 | 1 | 19,623 | —10 |
| Talbot | 21,578 | 1 | 21,578 | + 1 |
| Washington | 91,219 | 4 | 22,805 | + 4 |
| Wicomico | 49,050 | 2 | 24,525 | +12 |
| Worcester | 23,733 | 1 | 23,733 | + 9 |
| | 3,100,689 | 142 | | |

1 Unit of Population is 21,836    (+15% = 25,111    —15% = 18,561)

BARNES, J., filed the following dissenting opinion, in which HORNEY, J., concurred.

I dissent because it seems clear to me that Chapter 3 of the Laws of Maryland (Special Session, October 1965) (Senate Bill 8) is a constitutionally valid legislative apportionment plan. Senate Bill 8 like Chapter 2 of the Laws of Maryland (Special Session, October 1965) (Senate Bill 5) provides for a House of Delegates of 142 members, but provides for a Senate of 53 members rather than a Senate of 43 members as provided for in Senate Bill 5. I agree with the majority that the apportionment for the House of Delegates is valid and constitutional, but I cannot agree that under the apposite decisions of the Supreme Court of the United States, the provision in Senate Bill 8 for a Senate of 53 members denies equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States (Fourteenth Amendment).

I do not understand that there is any disagreement that if the provisions for the 53 member Senate in Senate Bill 8 are constitutional, these provisions would be given effect in view of Section 4 of Senate Bill 8 which provides that "in the event this Act shall be declared valid by the Court of Appeals of Maryland, then Chapter 2 (Senate Bill 5) * * * shall not become effective * * *." This legislative mandate establishes the preference of the General Assembly for the 53 member Senate if the provisions of Senate Bill 8 establishing it do not contravene the provisions of the Fourteenth Amendment.

This legislative mandate comes to us with peculiar force in this case as it must be conceded that the apportionment of members in one of the houses of the Maryland bicameral legislature is, subject to Constitutional limitations, a purely legislative function in regard to which the judicial branch of the state government is forbidden by the Maryland Constitution to interfere. Article 8 of the Maryland Constitution in regard to separation of powers provides:

> "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

Our predecessors indicated in 1829 in *Crane v. Meginnis*, 1 G. & J. 463, at 472 that:

"The legislative department is nearest to the source of power, and manifestly the predominant branch of the government."

This of necessity must be the case in a representative form of government. We held in *First Continental Sav. & Loan Ass'n., Inc. v. Director, State Dept. of Assessments and Taxation*, 229 Md. 293, 302, 183 A. 2d 347, 351 (1962), that the powers of the General Assembly are plenary except as restrained by the State or federal constitutions.

Indeed, it was not until the decision of the Supreme Court of the United States (Supreme Court) in *Baker v. Carr*, 369 U. S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663, on March 26, 1962 that the judicial branch of government, State or Federal, could consider judicially whether or not a House of a State legislature was constitutionally established. The Supreme Court itself had consistently held prior to *Baker v. Carr* that such an issue was not justiciable. The masterful dissenting opinion of Mr. Justice Frankfurter in *Baker v. Carr* reviewed the prior authorities (including *Kidd v. McCanless*, 352 U. S. 920, 77 S. Ct. 223, 1 L. Ed. 2d 157 (1956), decided only 5 years prior to *Baker v. Carr* in which the Supreme Court had itself by dismissing the appeal in *Kidd* held that the issues in regard to the composition of the Tennessee Legislature involved in *Baker v. Carr*, were not justiciable) and pointed out the lack of wisdom and the dangers involved in departing from the well established doctrine in a most sensitive area of state-federal relations. I have not yet seen any satisfactory answers to the points made by Mr. Justice Frankfurter and Mr. Justice Harlan in their dissenting opinions in *Baker,* but I, of course, agree that we are bound by the decisions of the majority of the Supreme Court on federal constitutional issues whether or not we think them sound or justified. It might be added that it was by no means clear, however, until our decision by a divided Court in *Maryland Committee for Fair Representation v. Tawes*, 228 Md. 412, 180 A. 2d 656 (1962) that our duty of obedience to the decisions of the majority of the Supreme Court extended to a

holding that *this Court* had power *under the Maryland Constitution* to strike down a provision of that Constitution establishing the membership in the General Assembly. Judges Henderson and Horney in their dissent in the *Maryland Committee* case were of the opinion that this Court had no such power but that the exercise of that power resided only in the federal courts.

I review these rather recent adventures in constitutional law only to indicate that the entire field is a new one fraught with grave dangers in a delicate area of state-federal relations and in which the Supreme Court has established no certain guidelines, preferring—properly I think—to consider each case as it arises in the light of general constitutional concepts which the Supreme Court has enunciated.

I agree with the majority that the most important decision of the Supreme Court of the 6 reapportionment cases, decided June 15, 1964 [1] bearing on the questions before us is *Reynolds v. Sims,* 377 U. S. 533, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964). Chief Justice Warren, for the Supreme Court, stated in *Reynolds v. Sims*:

> "For the present, we deem it expedient not to attempt to spell out any precise constitutional tests. What is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case. Developing a body of doctrine cn a case-by-case basis appears to us to provide the most satisfactory means of arriving at detailed constitutional requirements in the area of state legislative apportionment." (377 U. S. 578)

The Supreme Court recognizes the obvious fact that in the 50 States there are substantial and important differences in political traditions, economic conditions, and historical background

1. In addition to Reynolds v. Sims, they are WMCA, Inc. v. Lomenzo, 377 U. S. 633, 84 S. Ct. 1418, 12 L. Ed. 2d 568, Maryland Committee v. Tawes, 377 U. S. 656, 84 S. Ct. 1429, 12 L. Ed. 2d 595, Davis v. Mann, 377 U. S. 678, 84 S. Ct. 1441, 12 L. Ed. 2d 609, Roman v. Sincock, 377 U. S. 695, 84 S. Ct. 1449, 12 L. Ed. 2d 620, Lucas v. Colorado General Assembly, 377 U. S. 713, 84 S. Ct. 1459, 12 L. Ed. 2d 632.

which would make a simplistic, arithmetical requirement for legislative apportionment unworkable, abhorrent to the people affected and possibly destructive of orderly representative government. In short, the Supreme Court has no notion of establishing a constitutional Procrustean Bed on which the legislatures of the 50 States will be forced and then cut off or stretched to conform to its precise measurements. In my opinion, the majority has been led astray by its failure to appreciate and apply this declared policy of the Supreme Court; it does not see the constitutional "woods" for the arithmetical "trees".

What then are the applicable general principles enunciated by the Supreme Court in the Reapportionment Cases? As I read these cases they are:

I. "* * * a majority of the people of a State [should] elect a majority of that State's legislators." (377 U. S. 565)

II. More flexibility is constitutionally permissible with respect to state legislative apportionment than in congressional districting and this flexibility is constitutionally valid "so long as the resulting apportionment was one based *substantially* on population and the equal-population principle *was not diluted in any significant way.*" (Emphasis supplied.) (377 U. S. 578)

III. "A state may legitimately desire to *maintain the integrity of various political subdivisions,* insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. * * * *Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines,* may be little more than an open invitation to partisan gerrymandering." (Emphasis supplied.) (377 U. S. 578-579)

IV. "History indicates * * * that many States have deviated, to a greater or lesser degree, from the equal-population principle in the apportionment of seats in at least one house of their legislatures. So long as the divergences from a strict population standard are based *on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both*

*of the two houses of a bicameral state legislature.* (Emphasis supplied.) (377 U. S. 579)

V. "A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of *insuring some voice to political subdivisions, as political subdivisions.* Several factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality among districts is maintained. *Local governmental entities are frequently charged with various responsibilities incident to the operation of state government.* In many States *much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions."* (Emphasis supplied.) (377 U. S. 580-581)

VI. "But if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population *is submerged* as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all the State's citizens to cast *an effective and adequately weighted vote* would be unconstitutionally impaired." (Emphasis supplied.) (377 U. S. 581).

In my opinion the above quotations are far more apposite to the situation involved in the case at bar than are many of the quotations, also from *Reynolds v. Sims,* relied on in the majority opinion.

These general principles, particularly relevant to the case at bar, have for the most part, been given in the exact language used by Chief Justice Warren in enunciating them in *Reynolds v. Sims.* As he spoke for the majority of the Supreme Court, we are entitled, and indeed required, to take his words at their face value and to believe that the majority of the Supreme Court intends to adhere to them. In my opinion, the General Assembly and the people of this State are also entitled to have us apply these general principles to Senate Bill 8 and to sustain its constitutionality if the application of those principles permits it.

In my opinion, the provisions of Senate Bill 8 in regard to both the apportionment of seats in the House of Delegates and in the Senate fully comply with the general principles above set forth and Senate Bill 8 should be held to be constitutional as it does not deny citizens of any portion of this State the equal protection of the laws. As the majority agrees that the apportionment of the House of Delegates in Senate Bill 8 (which is the same as that in Senate Bill 5) is clearly constitutional, the discussion will be confined, for the most part, to the apportionment of the Senate.

## I and II

In the apportionment of the Senate by Senate Bill 8, a majority of the Senate seats are allocated on the basis of population. The resulting apportionment is based *substantially on population* and the equal-population principle is *not diluted in any significant way.*

The Senate of Maryland as established by the people in the Constitution of 1867 did not purport to be based on any equal-population concept. It, as subsequently amended, provided for one senator from each county and one senator from each of the six legislative districts of Baltimore City regardless of population making a total of 29 senators. There were great disparities in the population of the various counties and Baltimore City legislative districts and 19 counties with less than 25% of the population of the State elected 19, or approximately two-thirds of the senators.[2] There is no question that the apportionment of the Senate under Senate Bill 8 is based generally upon the equal-population principle. The plan of apportionment adopted

---

2. Even this apportionment of the Senate when taken together with the reapportionment of the House of Delegates, was not thought by Mr. Justice Stewart, in his dissenting opinion, to be unconstitutional on its face or that the entire plan reflected "no policy, but simply arbitrary and capricious action or inaction." He indicated in Maryland Committee v. Tawes, 377 U. S. 656 at 677, 84 S. Ct. 1440, 12 L. Ed. 2d 608, that the case challenging the constitutionality of the Maryland Senate should be remanded to determine whether the Maryland apportionment, including the 29 member Senate, "could be shown systematically to prevent effective majority rule."

in Senate Bill 8 for the Senate, although the senators are allocated by number in senatorial districts, substantially follows the same population principle as that followed for the allocation of seats in the House of Delegates. The Senate Bill 8 senate plan allots one senator to each political subdivision for a total of 24 and allots 27 of the remaining 29 seats of the 53 member body on a population basis based on the equal-population principle. This is also the same type of rule used in apportioning the United States House of Representatives. Under a strict application of the equal population rule as to the remaining 29 seats, Baltimore City would receive 14 rather than 12 senators. Baltimore City, however, has for many years been divided into 6 legislative districts so that it was more practicable to allot 12 seats to Baltimore City thus giving each legislative district 2 senators each. In Senate Bill 5, Baltimore City is also given 12 senators. The 2 seats not given to Baltimore City were apportioned one each to Prince George's and Montgomery Counties, two of the most populous and rapidly growing subdivisions, which have senatorial ratios under Senate Bill 8 which are almost mathematically perfect. It is clear that over one-half of the 53 Senate seats are apportioned according to population and that the 5 most populous subdivisions (Baltimore City, Baltimore, Montgomery, Prince George's and Anne Arundel Counties) elect 34 of the 53 senators, or 64.15% of the Senate while the remaining counties elect only 19 of the 53 Senators, or 35.85% of the Senate.[3] This not only gives the

3. In the majority opinion it is stated: "Additionally, it should be noted that under the scheme of the Bill (Senate Bill 8) some 37% of the State's population would elect, a majority of 27 senators." As explained in footnote 3a, of the majority opinion, this result is reached by combining the populations of 15 counties having the smallest populations and having 15 senators with two of the most populous counties, Montgomery and Prince George's, having 12 senators. Although the figures appear to be correct, the result has no political reality as this type of "combination" is most unlikely. Of far more significance in this case is the following: Using the 1960 census figures for population in Maryland the five most populous political subdivisions in Maryland containing 75.35% of the State's population elect 74.65% of the members of the House of Delegates and 64.15% of the members of the Senate. The remaining 19 less populous political subdivisions elect 24.65% of

most populous subdivisions majority control of the Senate but gives them more than the 60% majority needed to propose amendments to the Maryland Constitution (Art. XIV, Sec. 1), for enacting emergency legislation (Art. XVI, Sec. 2) and for overriding a veto by the Governor (Art. II, Sec. 17). It is quite apparent that under Senate Bill 8 the 5 most populous political subdivisions elect a large and dominating majority of the members of the Senate; and that the equal-population principle is indeed not "diluted in any substantial way." Effective majority rule is, in my opinion, clearly established.

## III, IV and V

As we have seen, the State may "legitimately desire to maintain the integrity of various political subdivisions." The practicability of accomplishing this rational State purpose may vary from State to State but in Maryland, because of the unusual importance of the counties in the Maryland government and their relatively small number, it is practicable to preserve their identity and give them a voice in the Senate without violating the general equal-population principle.

The importance of the county in Maryland as a governmental unit derives, in part, from the early date of the creation of many of them. Eleven of the twenty-three counties were in existence in 1695.[4] The Maryland Constitution of 1867 by the

---

the members of the House of Delegates and 35.85% of the members of the Senate. The calculation is as follows:

| | 1960 Census Population | % | House Seats | % | Senate Seats | % |
|---|---|---|---|---|---|---|
| Baltimore City, Baltimore County, Prince George's County, Montgomery County and Anne Arundel County | 2,336,409 | 75.35 | 106 | 74.65 | 34 | 64.15 |
| Remaining 19 Counties | 764,280 | 24.65 | 36 | 25.35 | 19 | 35.85 |

4. The dates of the creation of the counties in Maryland are as follows: St. Mary's 1637, Kent 1642, Anne Arundel 1650, Calvert 1650, Charles 1658, Baltimore 1659, Talbot 1662, Somerset 1666, Dorchester 1668, Cecil 1679, Prince George's 1695, Queen Anne's 1706, Worcester 1742, Frederick 1748, Caroline 1773, Harford 1773, Washington 1776, Montgomery 1776, Allegany 1789, Carroll 1836, Howard 1851, Wicomico 1867, Garrett 1872.

provisions of Article XIII, Section 1, effectively, as a practical matter, prevents the creation of any counties in addition to those already established.[5] The unusual nature of the Maryland Counties is set forth at page 419 of the Maryland Geological Survey, "The Counties of Maryland, Their Origin, Boundaries and Election Districts" (1907) as follows:

> "The counties in Maryland occupy a far more important position than do similar political divisions in many other states of the union. This prominence of the county is due primarily to the fact that in Maryland it serves as the unit of division of the territory of the State and is not formed by the combination of smaller integral units, as is the case in the North and West, where townships with their own local political organization are the units of political division. Where townships exist they are united to form a county and the county organization is accordingly more general and less complete than is the case in this state. Maryland possesses incorporated towns and villages analogous to those of other parts of the United States but the nearest analogue to a township—the election district, is not a political unit with its own individual government, but is rather a precinct serving for election and other purposes within the county. In Virginia, the counties are often composed of several Hundreds or Parishes which become the local units in popular consideration if not in political government."

Maryland has been fortunately spared the proliferation of incorporated towns and villages present in many states. Generally speaking the important municipal services outside of Baltimore City, are performed by the County governments. The need for local legislation is likely to continue to a substantial extent even though the Charter-type of County government should be extended in the future.

---

5. See Maryland Geological Survey, "The Counties of Maryland, Their Origin, Boundaries and Election Districts" (1907) at page 426. For a view of the distinctive history of each of the Maryland counties see pages 429 to 572.

In Maryland, health services are primarily organized at the county level.[6] Then too, jails, libraries,[7] the assessments of real property[8] and soil conservation programs[9] are organized on a county basis. Seventeen of the twenty-three counties construct, reconstruct and maintain their own road systems.[10]

An examination of the Maryland Manual, 1961-1962 pages 347, et seq., listing the local officials in even a small county such as Calvert County, indicates the wide range of governmental services and responsibilities given to the county government. In many of the larger counties there are additional agencies and officials, including Planning Commissions, Zoning Boards, Plumbing Boards, Industrial Development Commissions, Building Inspectors, Inspectors of Weights and Measures, Parks Boards, Recreation Commissions and other boards and commissions.

Most importantly, in Maryland one of the most vital and expensive of all governmental functions, namely, that of public education, is administered largely at the county, rather than at the State, level. In Maryland, the State, except in certain limited areas, retains only a visitorial power over the county school systems. In Andrews, "History of Maryland," pages 638-639, the learned author states:

> "* * * [I]n the original Maryland scheme there were twenty-three county boards, together with the independent unit of Baltimore City. These twenty-four boards in Maryland acquire especial significance when it is realized that New York, for example, has upward of ten thousand boards."

---

6. In the Maryland Manual 1961-1962 at page 69 it is stated: "Local Health Services make public health service available to residents of Maryland through the twenty-four local health departments. These local health officers with their staffs of nurses, sanitarians, and others, are the backbone of public health services in Maryland. These local units operate the public health programs in each county and Baltimore City * * *."

7. Md. Code, Art. 77, §§ 177-201.

8. Md. Code, Art. 81, § 232, et seq.

9. Md. Code, Art. 66C, § 91, see also Maryland Manual 1961-1962 p. 116.

10. Maryland Manual, 1961-1962 p. 99.

The unusual nature of the Maryland educational system of using counties as school districts is indicated by the fact that Maryland is one of only 5 States in the Union which has no school districts other than county units.[11]

When the expenditures of the local county government and those of the State government are considered, the importance of the county political subdivision is quite apparent. In the recent Interim Report of the Commission on State and County Finance (the Cooper Commission), it is indicated that in 1962 the direct expenditures of the local governments in Maryland amounted to $714,400,000.00, or 69.4% of the total expenditures of State and local governments. At page 13 of the Interim Report it is stated:

> "Of the total task of government, as measured by expenditures, the State bears about 30 percent and local governments bear 70 percent. The revenue sources are shared about 50-50. If highway expenditures and revenues are excluded * * * the division of responsibility becomes 25 percent State and 75 percent local, with the revenue split still remaining close to 50-50."

It seems clear, therefore, that in Maryland, the political subdivisions, given some (but not controlling) independent representation in the Senate by Senate Bill 8 are the basic framework in the governmental structure of the State. These political subdivisions carry out vital responsibilities of government in many most important areas, so that one of the factors mentioned in *Reynolds v. Sims* for a departure from population-based-representation is clearly met. It is present in Maryland to a far larger extent than was present in any of the reapportionment cases decided by the Supreme Court involving reapportionment plans in States other than Maryland.

As would be expected in a State in which the local political subdivisions are given such important governmental responsibilities, much of the legislation considered by the General Assembly of Maryland is "local legislation." The Chief Justice has

---

11. The other States are Hawaii, Rhode Island, Virginia and North Carolina. See Anderson et al., "Government in the Fifty States." (Rev. ed. 1960) pages 24-25.

quite properly indicated that this factor is one which may be considered as part of a rational State reapportionment policy justifying representation to a political subdivision, as such, and some divergence from a strict population standard.

This factor of "local legislation" applies with particular force in Maryland. Apparently Maryland is one of the few States in the Union having a published Code of Public Local Laws. Dr. Carl Everstine, the very able Director of the Department of Legislative Reference in "Maryland Legislative Council, Local Government: A Comparative Study" Research Report No. 23 (September 1944) page 1, stated:

> "Maryland occupies almost a unique position among the states, for its legislature gives perhaps more attention to the details of local government than does the legislature of any other state in the Union."

Dr. Everstine also pointed out the vital importance of the "local delegation" in the consideration of local bills as follows:

> "The rules of procedure adopted and followed by the legislatures of other states show an interesting contrast with those of Maryland with respect to the committees to which local bills may be assigned.
>
> "Local bills introduced into the General Assembly of Maryland usually are referred to select committees made up, in the House, of the members of the county delegation concerned, and in the Senate, of the Senator from the county concerned and the senators from two adjoining counties. Occasionally, a bill which would affect only one county may yet have implications of state-wide importance which will lead to its being referred to a standing committee, but it is the general practice to refer all local bills to select committees, and the rest of the legislature accepts without question the recommendations of these committees. There are no standing committees to which all local bills may be referred simply by virtue of their being local bills.
>
> "The practice in other states seems to be widely different than in Maryland. Every one of the other forty-

seven states has one or more standing committees to which, so far as one may judge from their names, the local bills of *all* counties may be referred." (Emphasis in text.)[12]

In Maryland's political life, the Senator from the county in regard to which the local legislation is concerned, usually plays a dominant role in its consideration, and ultimate passage or rejection. The senator has particular political responsibility in this field and is usually held accountable by the electorate for the success or failure of the local legislative program for the political subdivision. The senator has been thought of by his constituents as a member of the "upper" House of the bicameral legislature, and as such, to have greater authority and prestige than that enjoyed by the members of the House of Delegates. One might think that the senator's dominant position in local legislation would be taken over by the delegate in those counties who will only have one delegate, but this idea overlooks the political fact that *legislation must also pass the Senate*. There may well be a serious conflict between the policy advocated by the one delegate and that thought wise by a senator who does not reside in, and who is not politically dependent upon, the electorate from the county having the one delegate. And if the one-delegate county was in a senatorial district as provided for in Senate Bill 5 where there were *two* senators, neither of whom is from the one-delegate county, there might well be a divergence of opinion between the two senators with resulting confusion, lack of political responsibility and real injury to the local political subdivision involved. To take a concrete illustration from the provisions of Senate Bill 5, Senatorial District 15 is composed as follows: Cecil, Kent, Queen Anne's, Caroline and Talbot, having a combined population by the 1960 census of 121,498. Two senators are provided for Senatorial District 15. Under Senate Bill 5 the representation in the House of Delegates and the population of the individual counties would be as follows:

---

12. "Maryland Legislative Council, Local Government: A Comparative Study", Research Report No. 23 (September 1944) page 17.

| Name of County | Number of Delegates | Population, 1960 Census |
|---|---|---|
| Cecil | 2 | 48,408 |
| Kent | 1 | 15,481 |
| Queen Anne's | 1 | 16,569 |
| Caroline | 1 | 19,462 |
| Talbot | 1 | 21,578 |
| | | 121,498 |

It would seem reasonable to predict that Kent County with approximately 13% of the population of District 15 will most likely never have a senator from that county. Cecil County with approximately 40% of the total population of District 15 will most likely always have one senator. The other senator will most likely come from Talbot County having approximately 18% of the population of District 15. The *local* interests of Cecil County and Kent County may be quite different and if either one or both of the senators were not sympathetic with the local legislation presented by Kent County's one delegate, the local legislative program of Kent County would most likely never be enacted into law and there would be great difficulty in definitely fixing the political responsibility for that failure. On the other hand, if Kent County had one senator representing it in the Senate of Maryland as provided for in Senate Bill 8 this unfortunate situation—most injurious in my opinion to orderly and proper representative government — would be avoided. In short, so far as the Senate is concerned, it is difficult to have representative government without a representative.

The importance of local legislation in a consideration of reapportionment in Maryland appears in the Report to the Governor of Maryland of the Commission to Study Reapportionment of the General Assembly, filed January 31, 1964. There were two reports; the majority report recommended no changes in the existing Senate, and the minority report (or Hanson Report) recommended changes in the Senate, but recognized the vital importance of local legislation in Maryland and the desirability of having at least one senator from each political

subdivision. The Hanson Report was written by Professor Royce Hanson, Assistant Professor of Government at American University and who resided in Montgomery County. It was concurred in by other distinguished members of the Commission, *i.e.*, Samuel D. Hopkins, a resident of Baltimore City and a party to this suit; Dr. Roger Howell, a former Dean of the University of Maryland Law School, who resides in Baltimore City; Walter J. Bierwagen, representing the AFL-CIO, who resides in Prince George's County and Helen L. Koss, second vice president of the Maryland League of Women Voters (an amicus curiae in the case at bar) who resides in Montgomery County.

In the Hanson Report the following was stated:

*"Because of the significance of the counties and the City of Baltimore in the total scheme of government in Maryland, each county and the City should be assured of at least one representative in each house of the General Assembly. This assumes a voice for its corporate interest."* (Pg. 28)

\* \* \*

"We should like to see the size of the House reduced to its traditional figure (123 members), but do not believe this is possible, without giving up the minimum of one delegate, the advantages of which are important *in a state with so heavy a burden of local legislation* or without apportioning the senate strictly on population." (Pg. 29)

\* \* \*

"THE SENATE should be reapportioned to make possible its responsibility to a majority of the people, but it should be so designed to account for other factors which are not heavily weighted in the House. We recommend that the Senate contain 47 members apportioned on the basis of population, except that every county and the City should be guaranteed one senator, whatever its population. \* \* \* Because of the rapid population growth and the need for greater flexibility we recommend the 47 seat Senate, thereby providing 23 senators representative of population alone and 24

as guaranteed representatives of the jurisdiction. * * * We also emphasize that if the Senate's side should fall below 41 members, it would be necessary to combine small counties to form senatorial districts in order to provide even marginal control of the Senate for the vast majority of the state's electorage. *We do not think this is desirable in a state with much local legislation to enact.* It is not necessary if our recommendation is followed." (Pg. 30) (Emphasis supplied.)

Although some of the populous counties have adopted charters, the actual number of local bills has not significantly declined as the following table of bills referred to select committees will indicate:

|  | 1963 | 1957 | 1953 |
|---|---|---|---|
| "House | 410 | 570 | 452 |
| Senate | 219 | 201 | 215 |
| Total | 629 | 771 | 667 |
| Total All Bills | 1865 | 1616 | 1500 |
| Percentage of Bills Referred to Select Committees of All Bills Introduced | 33.7% | 47.7% | 44.5%" |

It is interesting to note that at the last Regular Session of the General Assembly in 1965 as shown by the index to the 1965 Laws of Maryland there were 18 bills enacted into law relating only to Kent County while there were but 15 such bills relating only to Cecil County.

In the study made by Professor V. O. Key, former professor of government at Johns Hopkins University and at Harvard University and a former president of the American Political Science Association, in his 1940 Report to the Legislative Council of Maryland entitled, "The Problem of Local Legislation in Maryland," he stated at page 1, Note 3:

"The total of 509 local bills passed in 1939 must have entailed in the neighborhood of the same number of conferences with county commissioners, city officials, and other persons requesting the introduction of bills.

Of the 509 bills passed, 173 were amended during the course of passage. It may be inferred that behind these amendments were conferences and discussions with local officials and other constituents desiring alterations in the bill as introduced."

The Supreme Court has always sustained the Maryland system of local legislation. See *Chappell Chemical and Fertilizer Co. v. Sulphur Mines Co.*, 172 U. S. 474, 19 S. Ct. 268, 43 L. Ed. 520 (1899) and more recently, *Salsburg v. Maryland*, 346 U. S. 545, 74 S. Ct. 280, 98 L. Ed. 281 (1954) in which the Supreme Court sustained the application of differing rules of evidence to different counties—a somewhat extreme example of local legislation. See also *McGowan v. Maryland*, 366 U. S. 420, 427, 537, 81 S. Ct. 1101, 6 L. Ed. 2d 393 (1961).

It is significant to me that Professor Robert G. Dixon, Jr., Professor of Law at George Washington Law School and Graduate School of Public Law, is of the opinion that the preservation of the integrity of local political subdivisions is a legitimate basis for divergence from a population standard. His article "Apportionment Standards and Judicial Power." 38 Notre Dame Lawyer 367 (1963), indicates his position and this article was cited with approval in the majority opinion in *Reynolds v. Sims*. See page 579 and note 60 of 377 U. S. Professor Dixon, in the same article, also stated at page 391:

"[R]epresentation of each county in the legislature may be a practical necessity in those states such as Florida and Maryland where there is a custom of handling local governmental matters by 'special' legislation (more properly called public-local legislation) rather than by public-general legislation or county home rule."

A matter of vital importance to a political subdivision in having at least one senator is in connection with the requirement in the Maryland Constitution that the Governor's appointments of various local officials be confirmed by the Senate. For example, the trial magistrates, the Liquor License Commissioners and other local officials of this type must have senatorial con-

firmation. The senator representing the local political subdivision involved has in almost all cases the "veto" power over a gubernatorial appointment of such a local official. That senator represents the *local* opinion in regard to the qualifications and desirability of the appointee. That opinion is important for the proper administration of local government and the local political subdivision involved should have a representative in the Senate for the performance of this important function.

Then too, scholarships to various educational institutions are allocated to the members of the Senate for appointment. Although generally there are examinations given to determine the general availability of students in the political subdivision for the awards, the ultimate selection from those receiving the highest grades, rests with the senator. It is unrealistic to suppose that many scholarships will be allocated to students from unrepresented counties in the Senate created by Senate Bill 5. Although I think it is unfortunate that courts are now required to enter this generally unwanted portion of the political arena, I think that in exercising our new judicial function we should not be politically naive. We must face and carefully consider the political realities involved; we cannot depend upon simple arithmetic.

Another important consideration which supports—in Maryland particularly—the concept of giving each political subdivision one senator in the upper house of the bicameral legislature, is to insure that the electorate of each political subdivision has a *voice* in the deliberations of that house. Maryland is unusually diversified in topography, climate, natural resources and in its economy. For example, the *only* ocean frontage, ocean park areas and ocean recreational areas are located in Worcester County. The center of the oyster and crab industry is in Somerset County. The electorate and their representatives from these two counties would have an appreciation of the problems and legislative needs arising from these local situations which no other electorate or representative could have. It is quite unlikely that either of these counties will ever have a State Senator in Senatorial District 16 set up by Senate Bill 5 as Worcester County has only approximately 20% and Somerset County only approximately 15% of the total population of Dis-

trict 16 (122,072 in the 1960 census) as contrasted with approximately 40% and 25% respectively of that total population in Wicomico County and Dorchester County. In short, the two senators from District 16 are most likely to come from Wicomico and Dorchester Counties which have approximately 65% of the population. But in my opinion it furthers a rational State policy to provide that these two smaller counties *should have a voice* of their own in the Senate of Maryland, not only to protect their own local interests but, perhaps more importantly, to give the entire Senate the facts and local point of view in regard to those important parts of the whole economy of the State. We should not lightly assume that the Supreme Court, which has shown such zeal in protecting the rights of minorities, will now rule that a minority of voters *will not even be permitted to be heard* in the upper house of the Maryland bicameral legislature. It is one thing to say that a minority shall not rule; it is quite another thing to say that it shall not be heard.

## VI

The Supreme Court, however, has indicated that even though representation of political subdivisions may be the result of a clearly rational state policy, this policy cannot submerge population as the controlling consideration in the apportionment of seats in the particular legislative body. Is population submerged as the controlling consideration in the apportionment of seats in the Senate of Maryland by Senate Bill 8? It seems clear to me that it is not.

It has already been observed that except for the allocation of the one senator for each political subdivision, a total of 24 senators, the remaining 29 seats of the 53 member Senate are allocated on a basis of population based on the rule of equal proportions. Well over one-half of the 53 senate seats are thus apportioned on the basis of population. The 5 most populous political subdivisions not only control a majority of the Senate seats but more than the 60% of the votes required to amend the Maryland Constitution, pass emergency legislation or override a veto. It seems obvious that not only is the principle of population in apportioning seats *not submerged,* but it is *domi-*

*nant and completely effective in its control of the Senate provided for in Senate Bill 8.*

It should be pointed out that the provisions of Senate Bill 8 in regard to the apportionment of Senate seats give substantially greater recognition to the principle of population than was recommended in the Report of the Committee on Congressional Redistricting and Legislative Apportionment, dated November 17, 1964. This Committee of the Legislative Council of Maryland consisted of 18 highly qualified members of the General Assembly of Maryland (9 from the Senate and 9 from the House of Delegates). Senator William S. James, President of the Senate was Chairman and Delegate Marvin Mandel, Speaker of the House of Delegates was Vice-Chairman. This able Committee recommended a Senate of 47 members in which the 5 more populous political subdivisions (Baltimore City, Baltimore County, Prince George's County, Montgomery County and Anne Arundel County) were allocated 28 seats and the remaining 19 counties were given one senator each, a total of 19 senators. Under this recommended Senate the 5 most populous political subdivisions received 59.57% of the total number of seats. In the Senate provided for in Senate Bill 8, the same 5 more populous political subdivisions received 64.15% of the total number of seats. The Committee clearly recognized the principle that each political subdivision should have at least one senator in the Maryland Senate.

The Supreme Court has not established any mathematical formula for determining degrees of disparity between the population of districts. It would be impracticable to do this based on a particular census. In any event, such a basis would have little enduring effect in a State with as rapidly growing a population as in Maryland; the mathematical basis would have little reality in a few years or even in several months. It should be kept in mind also that population, although possibly reflecting *generally* the probable number of qualified voters in one district as compared with another district, does not *automatically reflect the number of qualified voters* as the number of children who have not reached voting age in a fast growing community will be counted in the "population" of that district, but will not really reflect the electoral strength of that district *vis a vis* a slow

growing and older district having proportionately more quali-
fied voters. In short, a purely mathematical formula is neither
desirable nor feasible for application in reapportionment prob-
lems. See Professor Davis, "Apportionment Standards and Ju-
dicial Power", 38 Notre Dame Lawyer, 367 at pages 381-386.

When the total number of representatives in both the Senate
and the House of Delegates provided for in Senate Bill 8 are
considered together—which is a legitimate approach to a re-
apportionment problem—see 377 U. S. 577 and see also Pro-
fessor Davis, *supra,* at page 390 of 38 Notre Dame Lawyer, the
dominance of the population principle is clearly seen.

It is apparent that the Senate Bill 8 reapportionment of both
the House of Delegates and the Senate follows in general the
recommendations of the Hanson Report, although in the Han-
son Report a Senate of 47 members with one representative in
each house guaranteed to each political subdivision was recom-
mended, whereas there is a 53 member Senate provided for in
Senate Bill 8. It is interesting to note, however, that the Sen-
ate provided for in Senate Bill 8 gives Baltimore City and the
4 suburban counties a greater proportion of legislative power
than did the plan recommended by the Hanson Report.

On page 20 of the Hanson Report, Professor Hanson de-
scribed the method used in determining the allocation of legis-
lative power, as follows:

> "If we devise a means of measuring legislative power
> as a rough test of the total system of representation,
> the situation is even more clearly shown. Since the
> representative power is equally divided between the
> two houses, half the power is in each. Thus a unit's
> total legislative power is represented by $\frac{1}{2}$ its per-
> centage of the total membership of one house added to
> $\frac{1}{2}$ its percentage of its membership in the other.[8]
> (Footnote 8—A full explanation of this method can
> be found in Alan L. Clem, 'Measuring Legislative
> Malapportionment: In Search of a Better Yardstick.'
> *The Midwest Journal of Political Science,* VII, 125-
> 144 (1963).)
>
> "The Hanson report recommendations compare with

the distribution of legislative power under Chapter 3 as follows:

| | Hanson Report | | | | Senate Bill 8 Plan | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | % Pop. | % Del. | % Sen. | % Leg. power in both houses | % Del. | % Sen. | % of Leg. power in both houses |
| Baltimore City | 30 | 27 | 21 | 25 | 30 | 23 | 26 |
| 4 Suburban Counties | 45 | 38 | 36 | 37 | 44 | 42 | 43 |
| 9 Medium Counties | 17 | 20 | 21 | 21 | 18 | 17 | 17 |
| 10 Small Counties | 8 | 14 | 21 | 18 | 8 | 19 | 13 |

(Discrepancies in totals due to rounding.)"

In connection with the thought that the legislative process is to be considered as a whole in deciding reapportionment cases, I am of the opinion that an additional factor is to be considered, i.e., that Maryland is a "strong Governor" State. Not only does the Governor in Maryland have the usual veto power (which is a part of the legislative process designed to create a check upon ill considered legislation, see Article II, Section 17) but by Article III, Section 52 of the Maryland Constitution the Governor not only formulates the State Budget, but the General Assembly may not increase it unless it provides the necessary taxes to meet the increased expenditure. The history of this beneficent amendment to the Maryland Constitution in 1916 is set forth by Chief Judge Sobeloff, for the Court, in *McKeldin v. Steedman,* 203 Md. 89, 97, 98 A. 2d 561, 564 (1953), Chief Judge Sobeloff stated:

"The heart of the scheme, as stated by the Goodnow [13] Commission, is 'to impose upon the Governor

13. Dr. Frank J. Goodnow, then President of the Johns Hopkins University, was its chairman and among its distinguished members was F. Neal Parke, later a member of the Court of Appeals.

the sole responsibility * * * of presenting to the legislature a complete and comprehensive statement of the needs and resources of the State * * *; to make it impossible for the legislature so to change the plans proposed by the Governor as to produce a deficit; but, to permit the legislature to make provision for any purpose not included in the Governor's plan on the condition that it provide for the revenue which the accomplishment of its purpose necessitates.' "

The Governor, by Article II, Section 17 of the Maryland Constitution is given the power to veto *items* in any bill making appropriations.

These constitutional provisions and the various statutes implementing the formulation of the State budget and fiscal policy by the Governor give him a dominant position in the fiscal policy of the State not usually enjoyed by the Chief Executive of a State, but more usually performed by the legislature itself. This most important participation by the Governor, who is elected by the electorate at large throughout the State, in the legislative process is, to my mind, an added reason why some—but not dominant—representation should be given the smaller political subdivisions so that they will not be completely overwhelmed by the dominant majority. Indeed the power of the Governor who must depend upon the majority of voters Statewide, is such that *in the final analysis* (although sometimes temporarily delayed) the will of the majority has in fact been effective in Maryland even before the present constitutional requirement to reapportion became a part of the constitutional law of the United States.

It is clear to me that under the provisions of Senate Bill 8 population is not submerged. In my opinion, Senate Bill 8, now Chapter 3 of the Laws of Maryland (Special Session, October 1965) should have been declared constitutional, valid and effective by the Chancellor and I would reverse his decree to the contrary.

I am authorized to state that Judge Horney concurs in the views here expressed.