## DIXON v. BOARD OF SUPERVISORS OF ELECTIONS OF BALTIMORE CITY

[No. 355, September Term, 1966 (Adv.).]

*Decided, per curiam, August 22, 1966.*

*Opinion filed September 14, 1966.*

The cause was argued before PRESCOTT, C. J. and HAMMOND, HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

*Frank A. DeCosta, Jr.,* for appellant.

*Edward L. Blanton, Jr., Assistant Attorney General,* with whom was *Thomas B. Finan, Attorney General,* on the brief for appellee.

MARBURY, J., delivered the opinion of the Court.

After argument, by per curiam order, we reversed the order of the Superior Court of Baltimore City which denied the appellant's petition for a writ of mandamus to compel the Board of Supervisors of Election of Baltimore City to accept and certify his candidacy for the Democratic nomination for the House of Delegates from the Fourth Legislative District of Baltimore City, and ordered that the mandate directing the writ of mandamus prayed for below be issued forthwith. The reasons for our order follow.

The facts are not in dispute. On November 18, 1965, appellant moved from 709 Wilborn Avenue (located in the Fifth Legislative District of Baltimore City) to 1607 North Avenue (located in the Fourth Legislative District of that city). Appellant, who has always lived in Baltimore City, on December 24, 1965, notified the appellee of the change in voting residence, and on July 5, 1966, filed his certificate of candidacy. On August 4, 1966, the appellee notified the appellant that he was not (in its opinion) eligible for the office sought because he failed to meet the residency requirement set forth in the Maryland Constitution. Thereafter, the appellant petitioned the Superior Court of Baltimore City to issue a writ of mandamus which would compel the appellee to allow his candidacy. A hearing was held before Judge Perrott who, on August 17, 1966, denied the writ.

The salient question involved on this appeal is whether the appellant meets the residency requirement of Article III, Section 9 of the Maryland Constitution, which provides in pertinent part:

> "No person shall [be] eligible as a Senator or Delegate, who at the time of his election, is not a citizen of the State of Maryland, and who has not resided therein, for at least three years, next preceding the day of his election, and the last year thereof, in the County, or in the Legislative District of Baltimore City, which he may be chosen to represent, *if such County, or Legislative District of said City, shall have been so long established; and if not, then in the County, or City, from which, in whole, or in part, the same may have been formed;* * * *." (Emphasis added.)

Despite the fact that appellant, on the day of the next general election, will have lived in the Fourth Legislative District for less than one year, he contends that he meets the above residency requirements because that district will not have been "established" for one year prior to the date of that election. We agree, and hold that it was necessary for the appellant to live in the Fourth District only at the time his candidacy qualifications were determined.

This question can best be resolved by first focusing on the legal meaning of "established" as used in Article III, Section 9, and then next reviewing the rather involved legislative and judicial history of the present law which sets forth *inter alia* the lines for the Fourth Legislative District of Baltimore in order to ascertain whether those lines were "established" one year prior to the general election on November 8, 1966.

In *O'Keefe v. Irvington Co.*, 87 Md. 196, 201, 39 Atl. 428, our predecessors cited with approval the following definitions of the term "to establish": (1) "to settle firmly"; (2) "to settle certainly and fix permanently"; and the word "established" was defined as "permanently settled and confirmed." It is our view that the selection of the word "established" in Section 9 of Article III was for the purpose of requiring a reliable date from which the one year computation could be made and thus the *O'Keefe* definition is apposite. To the same effect is *Novak v. Orphans' Home, Etc.*, 123 Md. 161, 166, 90 Atl. 997, where Judge Stockbridge, for the Court said:

> "The word 'establish' may have and be used with varying meanings, the most common of which is to be found, or to bring into being, but it is also used to mean to place upon a secure foundation or basis, and hence to strengthen that which is already in being. *Davenport v. Caldwell*, 10 S. C. 317; *State v. Rogers*, 107 Ala. 444."

The Fourth District was not established until it was settled certainly by being placed on a secure legal foundation.

On June 1, 1964, House Bill No. 28 (enacted as Chapter 1 of the Laws of Maryland, Special Session, 1964) became effective, having been signed by the Governor on April 7, 1964.

This act repealed Section 474 of the Code of Public Local Laws of Baltimore City (1949 ed.), relating generally to councilmanic and legislative districts, and enacted a new Section 474 to stand in the place of the section repealed. This act revised legislative districts of Baltimore City, including the Fourth.

On June 15, 1964, some two weeks after the date on which Section 474 was to go into effect, the Supreme Court announced its decision in *Maryland Committee v. Tawes,* 377 U. S. 656, 12 L. Ed. 2d 595, in which it reversed this Court, and held that the apportionment of the seats in the Maryland House of Delegates and Senate did not afford equal protection of the law to the citizens of certain political subdivisions of Maryland because the seats in both houses of the Legislature were not sufficiently apportioned on a population basis. The Supreme Court then directed that *"under no circumstances should the 1966 elections of members of the Maryland Legislature be permitted to be conducted pursuant to the existing or any other unconstitutional plan."* (Emphasis added.) 377 U. S. 676. In the face of that mandate there can be little question but that as of the date of that opinion, the lines of the Fourth Legislative District (or that of any other legislative unit of the State) had not been established in any legal sense of the word.

Aware that the 1966 elections would be held at large unless a proper apportionment scheme was forthcoming, the Maryland Legislature met in special session on October 11, 1965, and on October 27 of that year, two reapportionment plans were enacted, *i.e.,* Senate Bills Nos. 5 and 8 (Chapters 2 and 3, respectively, of the Laws of Maryland of that special session). Both bills provided for identical schemes for reapportionment of the House of Delegates, and they left unchanged the boundaries of Baltimore's Fourth Legislative District as drawn by the 1964 enactment, but the two bills were substantially different in their apportionment of the Senate. Both bills by their terms were to "become effective" on June 1, 1966, however Senate Bill No. 8 contained the provision that if it "be declared valid by the Court of Appeals of Maryland" then Senate Bill No. 5 "shall not become effective." In *Hughes v. Maryland Committee,* 241 Md. 471, 217 A. 2d 273 (decided per curiam on January 11, 1966, opinion filed March 2, 1966), we

held that Senate Bill No. 8 did not provide a constitutionally valid apportionment scheme. It is clear from our opinion in *Hughes* that, in determining the permissibility of an apportionment scheme, the location of lines establishing voting districts in relation to the population is of major importance. In holding Senate Bill No. 8 invalid, Chief Judge Prescott, for the Court, said at page 481 of 241 Md.:

> "* * * [Where] the county lines are predominantly utilized for political subdivision purposes and the weight of citizens' votes are debased to a rate of 1 to 6, can it be seriously contended the Bill 'still afford[s] adequate representation to all parts of the State,' or that the apportionment is one based *substantially* on population, and 'the equal population principle [has not been] diluted in any significant way'?"

*Hughes v. Maryland Committee*, 384 U. S. 950, 16 L. Ed. 2d 547, cert. den. May 23, 1966.

In *Hughes v. Maryland Committee, supra,* although neither party contested the validity of Senate Bill No. 5, we nevertheless thought it necessary to pass upon its validity in view of the mandate of the Supreme Court in *Maryland Committee v. Tawes, supra,* and held that Senate Bill No. 5 did provide a constitutionally permissible apportionment plan for both branches of the legislature. Our opinion in *Hughes,* together with the lengthy debates in the legislature during both the regular and special sessions of the General Assembly of 1965, demonstrates that the lines for the legislative districts of Baltimore City were not "established" for the 1966 elections within the meaning of Article III, Section 9 of the Maryland Constitution, as that term was defined in *O'Keefe* or *Novak,* both *supra*—"to settle certainly and fix permanently," and "to place upon a secure foundation," until this Court approved the apportionment scheme in Senate Bill No. 5 by per curiam opinion on January 11, 1966, and the Supreme Court denied certiorari on May 23, 1966. Under such circumstances the district lines forming the Fourth District of Baltimore City have been "established" for less than one year. Therefore, the lower court erred in upholding the Board of Election Supervisors in applying the

one year district residency requirement, and should have applied the exception set forth in Section 9, namely, that a one year residency in Baltimore City, coupled with a three year residency in the State of Maryland was sufficient.

Appellee contended that since the lines for the Fourth Legislative District of Baltimore were set forth in House Bill No. 28, which was to be effective as of June 1, 1964, and there was no "change" in those lines under Senate Bill No. 5, that therefore the Fourth District was "established" as of June 1, 1964, more than one year prior to the 1966 election, and hence the exception in Section 9 of Article III of the Constitution, should not apply. This contention ignores the history of apportionment litigation and the decision of the Supreme Court in *Maryland Committee v. Tawes, supra,* decided on June 15, 1964, subsequent to the effective date of the act. It is clear from a reading of Senate Bill No. 5 that the Legislature did not consider the district lines of Baltimore City to be established since changes were made in other districts in Baltimore City. Moreover, appellee's arguments would require the conclusion that Senate Bill No. 5, insofar as it does set forth the district lines for the Fourth District, contains mere surplusage and that the June 1, 1966 effective date had no significance as it relates to the Fourth District. Article III, Section 9, expressly uses the word "establish" rather than "change" or "altered". Hence, merely showing that there had been no "change" or "alteration" in the Fourth District lines by House Bill No. 28, or by the later Senate Bill No. 5, does not satisfy the larger definition implied in "establish."

Contrary to the contention presented in the appellee's brief the appellant does not argue that the Section 9 exception would permit him to run at large from any district in Baltimore. Since the appellant now resides in the Fourth District there is no merit in a subsidiary contention raised by the appellee that an impediment exists as to his candidacy by Section 42E (c) of Article 40 (Senate Bill No. 5) which provides that the candidate reside in that "portion of a County or of Baltimore City which is a part of the State Senatorial District; * * *." It is obvious from a reading of the above mentioned section that it deals with the qualifications for candidacy for the Senate and

not the House of Delegates. Even if the appellee intended to direct our attention to the portion of Senate Bill No. 5, Section 42B (e), which refers to residency requirements of candidates for the House of Delegates, it is still availed nothing. Section 42B (e) provides in pertinent part:

"* * * All Delegates in Baltimore City shall be residents of and elected from their respective districts, and they shall not be elected at large from Baltimore City."