MARYLAND CITIZENS COMMITTEE FOR FAIR CONGRESSIONAL REDISTRICTING, INC., a non-profit corporation, Roland I. Perusse, Mary W. Kaufman, and Milton F. Lunch

v.

J. Millard TAWES, as Governor of the State of Maryland, and Lloyd Simpkins, as Secretary of State of the State of Maryland.

Civ. No. 15178.

United States District Court
D. Maryland.

May 3, 1966.

James H. French, Washington, D. C., Alfred L. Scanlan, Bethesda, Md., and Shea & Gardner, Washington, D. C., for plaintiffs.

Thomas B. Finan, Atty. Gen. of Maryland, and Robert F. Sweeney, Asst. Atty. Gen., Baltimore, Md., for defendants.

A. Adgate Duer and Robert C. Prem, Baltimore, Md., for Charles McC. Mathias, Jr., and Rogers C. B. Morton, intervening plaintiffs.

Hervey G. Machen, Hyattsville, Md., pro se, intervening defendant.

Patrick F. X. McGucken, Emmitsburg, Md., pro se, intervening plaintiff.

George Cochran Doub and Weinberg & Green, Baltimore, Md., for Clarence D. Long, intervening plaintiff.

Paul Berman and Melvin J. Sykes, Baltimore, Md., for George H. Fallon, Edward A. Garmatz and Samuel N. Friedel, intervening defendants.

John W. Hardwicke, Webster, Harford Co., Md., pro se, intervening plaintiff.

Marvin H. Smith, Denton, Md., for Republican State Central Committee, intervening plaintiff.

Walter L. Green, Hyattsville, Md., pro se, intervening defendant.

Juanita Jackson Mitchell and Archie D. Williams, Baltimore, Md., for Carl J. Murphy and others, intervening plaintiffs.

Bennett Crain, Jr., County Sol., and Joseph Charles Jacobs, Asst. County Sol., Annapolis, Md., for Joseph W. Alton, Jr., County Executive of Anne Arundel County, intervening plaintiff.

Wilbur R. Dulin, Annapolis, Md., for Joseph N. Collison, intervening plaintiff.

Before SOBELOFF, Circuit Judge, and THOMSEN and NORTHROP, District Judges.

SOBELOFF, Circuit Judge.

More than two years ago this three-judge District Court was convened pursuant to 28 U.S.C. §§ 2281 and 2284 to consider and act upon a complaint attacking the validity of Maryland's congressional districting law, Chap. 739, § 1, Acts 1957; Art. 33, §§ 159–166, Ann. Code of Md., 1957. After taking testimony and hearing arguments of the parties and numerous intervenors, the court decided on March 21, 1964, that the plan embodied in that Act was unconstitutional, since it did not conform to the Supreme Court's "one man, one vote" requirement. Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The court likewise held invalid Section 1 of Chapter 380 of the Laws of Maryland, 1963, which was then pending on referendum. We declared that it failed to meet constitutional standards, and, even if approved at the 1964 election, could not be permitted to stand.

In the course of the hearing the Attorney General of Maryland, after consultation with the Governor, advised the court that in light of the unsuccessful efforts in the preceding 1964 session of the General Assembly to achieve a constitutional redistricting law there was then no possibility of legislative action. It was suggested, however, that if the court would allow the forthcoming 1964 congressional elections to proceed on the basis of the existing law, a later session of the Legislature would provide a more favorable climate for redistricting. Accordingly, while the court declared the provisions of the 1957 Code unconstitutional, it nevertheless stayed the effective date of its decree till after the 1964 election, and retained jurisdiction of the case in order to pass on any plan that might be enacted at a future session by the General Assembly. 228 F.Supp. 956 (D. Md.1964).

The 1965 session passed a congressional redistricting law, Chap. 371, § 1, Acts 1965, which was, however, petitioned to referendum, for approval or disapproval by the voters in the November, 1966 election. The average population of all the districts is 387,586, one-eighth of 3,100,689, the total population of the State. However, the Second District, the largest according to that enactment, would have a population of 443,331, which is 113,505 above the smallest district, the First, which would have a population of only 329,826. The enactment thus prescribes a ratio of 1 to 1.34 between the district with the least population and the district with the greatest population. In plain words this means that a vote in the least populous district was worth about one-third more than a vote in the most populous district. The disparity is too great.

At the regular session of the General Assembly in January, 1966, the Attorney General forthrightly declared to the General Assembly his opinion that the 1965 redistricting measure may have created a disparity too great to be tolerated under

the Supreme Court's requirement of equal representation, and urged the passage of a new congressional districting plan more closely conforming to the requirements of the Constitution as interpreted by the Supreme Court. Despite the valiant efforts of the Attorney General and others, the General Assembly found itself unable to agree upon a new redistricting measure. The Governor immediately called a special session of the Legislature to deal with this problem. Again the legislators, after vigorous debate, failed to reach agreement and adjourned on April 6, 1966, without taking action.

On April 25, 1966, this court reconvened and heard argument from the parties and intervenors as to the manner in which the 1966 congressional elections should be conducted. At this hearing the Citizens Committee, which initiated the litigation, and the State of Maryland argued that the redistricting measure adopted by the 1965 General Assembly sufficiently complies with the constitutional principles laid down by the Supreme Court and that this court should adopt that measure for the 1966 congressional election. A number of the intervenors disputed the validity of the 1965 plan. John W. Hardwicke, a member of the Maryland House of Delegates, and the three Baltimore City congressmen as a group, submitted separate alternative plans. Representative Clarence Long opposed these plans and urged the court to adopt the terms of the measure now on referendum or to order at-large congressional elections for 1966. Other intervenors denied the validity of the 1965 Act and opposed the alternative plans submitted by Hardwicke and by the Baltimore City congressmen, but agreed that the court has the power and the duty to realign the districts and to avoid the confusion of at-large elections.[1]

■ As above indicated, Chapter 371 of the Acts of 1965, in our opinion, deviates too widely from the constitutional norm of "one man, one vote" to be tolerated. Some departure from the ideal is of course inevitable. The equality which the Constitution commands allows, however, "only minor deviations which may occur in the recognition of rational and legitimate factors, free from the taint of arbitrariness, irrationality and discrimination. Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 12 L. Ed.2d 620 (1964)." Drum v. Seawell, 250 F.Supp. 922 (M.D.N.C. 1966), aff'd sub nom. Drum v. Austin, 86 S.Ct. 1237 (Apr. 4, 1966). There is no rational justification for one district exceeding in population the average of all the districts in the state by 14.38%, while another falls below the average by 14.90%—a gross discrepancy of one-third. See Baker v. Clement, 247 F. Supp. 886 (M.D.Tenn.1965) (32% discrepancy invalid); Roberts v. Babcock, 246 F.Supp. 396 (D.Mont.1965) (46% discrepancy invalid); Meeks v. Anderson, 229 F.Supp. 271 (D.Kan.1964) (44% discrepancy invalid). Cf. Grills v. Branigan (S.D.Ind. Feb. 17, 1966) (20% discrepancy tolerated); Moore v. Moore, 246 F.Supp. 578 (S.D.Ala.1965) (14% discrepancy tolerated).

■ Even if a district plan initially comports with the one-to-one formula, discrepancies may be expected to arise with changing conditions. Such discrepancies are unavoidable and must be tolerated for a time, till the next census, but in initial districting the aim should be to come as closely as possible to a one-to-one ratio. There is no showing in this case that the difference of one-third is unavoidable or justified upon any legally acceptable ground. We must therefore

---

1. Representatives of Anne Arundel County, after the conclusion of the hearing, submitted an alternative plan of their own, which is designed to avoid the splitting of Anne Arundel County. In many of its features it adheres to the 1965 enactment of the General Assembly, although it decreases the population variance from 1 to 1.34 to 1 to 1.22.

Congressmen Morton and Mathias expressed preference for Chapter 371, or a modified version of the Hardwicke plan, and strenuously opposed at-large elections.

declare Chapter 371 of the Acts of 1965 invalid and forbid its submission in the referendum set for the fall elections of 1966.

Nor can we adopt this invalid measure on an interim basis for the 1966 election of members of Congress from Maryland. We have already allowed the 1964 election to be conducted on the basis of a districting law found to be unconstitutional. Even if disposed to permit another election upon the basis of a void statute, we should not do so because this would offend the rule of the Supreme Court in Swann v. Adams, 86 S.Ct. 767 (Feb. 25, 1966). There the Supreme Court, in a reapportionment case, summarily reversed the action of a three-judge district court in Florida in permitting as a temporary measure the use of a law held invalid. We have already exercised such tolerance in our 1964 stay order; we do not feel free to do so again.

■ We do not doubt the power of the court in these circumstances to adopt a redistricting plan to remain in force till the General Assembly adopts its own constitutionally valid plan. Three-judge federal courts have redistricted in at least three instances. Klahr v. Goddard, 250 F.Supp. 537 (D.Ariz. 1966); Roberts v. Babcock, 246 F.Supp. 396 (D. Mont.1965); and see People ex rel. Scott v. Kerner, 33 Ill.2d 460, 211 N.E.2d 736 (1965), where the plan was the product of consultation between the state court and a three-judge federal court. But cf. Park v. Faubus, 238 F.Supp. 62 (E.D.Ark.1965) (at-large congressional elections ordered); Calkins v. Hare, 228 F.Supp. 824 (E.D.Mich.1964) (same).

■ The court has thoughtfully considered the respective arguments of the parties and intervenors. Their views are naturally divergent, but in exposing the deficiencies of competing views, each has been of assistance to the court and each has provided a measure of guidance toward a proper solution. Having this advantage, we have endeavored to avoid as far as possible the defects that were pointed out and to avail ourselves as far as possible of whatever is sound in any of the plans submitted. A basic goal has been to achieve the requirements of equality laid down in the Supreme Court decisions without doing unnecessary violence to the heart of existing districts, county lines, and district lines within the counties and ward lines in the city. We think that our plan makes the districts as compact as possible, and in the few cases where it was deemed necessary to split a county we have taken into account the character of the neighborhoods involved. In short, we have given dominant weight, as we think we must, to the population factor, without sacrificing other relevant considerations. In our plan the maximum deviation from the ideal of equality is only 5,624 (1.4%) over the average, in the Second District, and 4,349 (1.1%) below the average, in the Fourth District, so that the maximum deviation in the weight of a vote is only in the ratio of 1 to 1.026.

■ A difficulty encountered by anyone who undertakes in 1966 to draw district lines with a view to achieving substantial population equality, is that the only accurate figures available are those from the 1960 census. The dilemma presents two possible choices: to accept the 1960 census figures which are not up to date, or to attempt to make estimates of changes in population figures since that date. Neither choice is a happy one, but we have concluded that it is better to adhere to the census figures than to engage in speculative estimates or projections which vary widely with the estimators and the manner in which they handle the figures available to them from various sources. The alternative we have rejected would indeed lead into a mathematical thicket. See Klahr v. Goddard, 250 F.Supp. 537 (D.Ariz. 1966).

Chapter 371, now on referendum, gives the First District a spread from the lower tip of the Eastern Shore, north through Cecil, Harford and part of Baltimore County. Despite this great expanse of territory, the district so devised is still 14.9% below the average for the Maryland districts. The plan we adopt termi-

nates the First District at the Cecil-Harford boundary, keeping Harford in the Second District, where it has been. Instead, we include in the First District the Western Shore counties bordering on the Chesapeake Bay, St. Mary's, Calvert and the southern portion of Anne Arundel County. This results in a homogeneous and compact district.

■ It is entirely appropriate to recognize the existence of metropolitan communities. Much of the influx into Baltimore County to the north and Anne Arundel County to the south stems from Baltimore City. The settlements in the county nearest the city consist of people quite like those living on the other side of the City's boundary lines. Present district boundaries are not sacrosanct, and may be extended into neighboring counties, if this is necessary to constitute districts of sufficient size.

The new Fifth and Eighth Districts are essentially in the metropolitan Washington area.

The populations of the several districts are computed according to the 1960 census data, as follows:

The First Congressional District shall consist of:

| | |
|---|---:|
| Calvert | 15,826 |
| Caroline | 19,462 |
| Cecil | 48,408 |
| Dorchester | 29,666 |
| Kent | 15,481 |
| Queen Anne's | 16,569 |
| St. Mary's | 38,915 |
| Somerset | 19,623 |
| Talbot | 21,578 |
| Wicomico | 49,050 |
| Worcester | 23,733 |
| Anne Arundel (new 5th, 6th and 7th councilmanic districts; precincts 5, 6 and 7 of the new 4th councilmanic district) | 89,215 |
| | 387,526 |

The Second Congressional District shall consist of:

| | |
|---|---:|
| Baltimore County (4th, 7th, 8th, 9th, 10th, 11th, 12th and 15th Districts) | 316,488 |
| Harford | 76,722 |
| | 393,210 |

The Third Congressional District shall consist of:

Baltimore City:

| | | |
|---|---:|---:|
| 1st Ward (all) | 21,185 | |
| 2d Ward (all) | 10,401 | |
| 3d Ward (all) | 7,610 | |
| 4th Ward (all) | 7,966 | |
| 5th Ward (all) | 8,703 | |
| 6th Ward (all) | 20,645 | |
| 7th Ward (all) | 24,749 | |
| 8th Ward (all) | 47,610 | |
| 21st Ward (all) | 13,955 | |
| 22d Ward (all) | 6,475 | |
| 23d Ward (all) | 10,159 | |
| 24th Ward (all) | 14,803 | |
| 25th Ward (precincts 3–19, inclusive) | 51,535 | |
| 26th Ward (precincts 1–24, inclusive) | 48,801 | |
| | | 294,597 |
| Anne Arundel County (new 1st, 2d and 3d councilmanic districts) | 90,600 | 90,600 |
| | | 385,197 |

The Fourth Congressional District shall consist of:
Baltimore City:

| | | |
|---|---:|---:|
| 9th Ward (all) | 44,612 | |
| 10th Ward (all) | 16,604 | |
| 11th Ward (all) | 11,546 | |
| 12th Ward (all) | 34,984 | |
| 13th Ward (all) | 37,788 | |
| 14th Ward (all) | 22,240 | |
| 17th Ward (all) | 13,287 | |
| 18th Ward (all) | 15,462 | |
| 26th Ward (precincts 25–45, inclusive) | 37,835 | |
| 27th Ward (precincts 1–85, inclusive) | 121,137 | |
| | | 355,495 |
| Baltimore County (election district #14) | 27,742 | 27,742 |
| | | 383,237 |

The Fifth Congressional District shall consist of:

| | | |
|---|---:|---:|
| Prince George's | 357,395 | |
| Charles | 32,572 | |
| | 389,967 | |

The Sixth Congressional District shall consist of:

| | | |
|---|---:|---:|
| Garrett | 20,420 | |
| Allegany | 84,169 | |
| Washington | 91,219 | |
| Frederick | 71,930 | |
| Carroll | 52,785 | |
| Howard (2d, 3d and 4th election districts) | 15,605 | |
| | | 336,128 |
| Baltimore County: | | |
| (that part of election district #1 which lies outside the Beltway) | 26,991 | |
| (that part of election district #2 which lies outside the Beltway) | 19,694 | |
| (election district #5) | 2,551 | |
| (election district #6) | 1,627 | |
| | | 50,863 |
| | | 386,991 |

The Seventh Congressional District shall consist of:

Baltimore City:

| | | |
|---|---|---|
| 15th Ward (all) | 78,635 | |
| 16th Ward (all) | 51,779 | |
| 19th Ward (all) | 20,477 | |
| 20th Ward (all) | 46,224 | |
| 25th Ward (precincts 1 and 2) | 11,976 | |
| 27th Ward (precincts 86–105, inclusive) | 45,146 | |
| 28th Ward (all) | 34,695 | |
| | | 288,932 |

Baltimore County:

| | | |
|---|---|---|
| 1st election district, precincts 1–3, 5–15, 23–26 (on City side of Beltway) | 26,818 | |
| 2d election district, precincts 1–6, 8 and 14 (on City side of Beltway) | 7,810 | |
| 3d election district | 26,999 | |
| 13th election district | 35,708 | |
| | | 97,335 |
| | | 386,267 |

The Eighth Congressional District shall consist of:

| | | |
|---|---|---|
| Montgomery | 340,928 | |
| Howard: | | |
| 1st, 5th and 6th election districts | 20,547 | |
| Anne Arundel: | | |
| Precincts 1–4, inclusive of the new 4th councilmanic district | 26,819 | |
| | | 388,294 |

The court expresses its appreciation to all who have cooperated in the presentation of data and argument, and especially to Dr. Carolyn (Mrs. William C.) Battle, a volunteer worker of the League of Women Voters, who assisted the court in various computations. The Attorney General is requested to prepare an appropriate decree.