Louis **POHORYLES**, James J. Lombardi, Ralph I. Sonntag, Stewart B. Preston, as Maryland Citizens for a Representative General Assembly, individually, and in behalf of all other Maryland residents now residing in Prince George's County, as well as in Montgomery and Anne Arundel Counties, who are eligible to vote in the Primary Election to be held in early September, 1970, or in the General Election, to be held in early November, 1970, Plaintiffs,

and

Board of County Commissioners for Prince George's County, Maryland, and Steny H. Hoyer, et al., Intervening Plaintiffs,

v.

Marvin **MANDEL**, Governor, Board of State Canvassers: Willard A. Morris, State Administrator of Election Laws, Louis L. Goldstein, Comptroller and Member of the Board of State Canvassers, John A. Luetkemeyer, State Treasurer and Member of the Board of State Canvassers, James Lloyd Young, Clerk, Court of Appeals and Member of the Board of State Canvassers, Francis B. Burch, Attorney General and Member of the Board of State Canvassers, and the Board of Supervisors of Elections of Prince George's County, Maryland, and the members thereof, namely: Helen R. McGuigan, Richard L. Otto and Thomas Dugan, Board of Supervisors of Elections, Defendants,

and

Mayor and City Council of Baltimore, a municipal corporation, Intervening Defendant.

Civ. No. 70–399.

United States District Court, D. Maryland.

April 28, 1970.

Martin H. Freeman, Upper Marlboro, Md., for plaintiffs.

Henry R. Lord, Asst. Atty. Gen. (Francis B. Burch, Atty. Gen., and Robert F. Sweeney, Deputy Atty. Gen., on the brief), for defendants.

Steny H. Hoyer et al., pro se, intervening plaintiffs.

Lionell M. Lockhart, County Atty., Upper Marlboro, Md., for Board of County Commissioners of Prince George's, intervening plaintiffs.

Clayton A. Dietrich, Chief Asst. Sol. (George L. Russell, Jr. City Sol., Am-

brose T. Hartman, Deputy City Sol., Richard R. Goldberg and A. Douglas Owens, Asst. City Sols., on the brief), for Mayor and City Council of Baltimore, intervening defendant.

THOMSEN, Chief Judge.

Challenging the constitutionality of the apportionment of the Maryland General Assembly, plaintiffs seek (a) a declaratory judgment that the controlling statute violates the Fourteenth Amendment, and (b) an injunction against the Governor and the election officials of the State "from acting *ultra vires* in applying the present apportionment" and directing them "that the primary and general elections of 1970 of representatives to the Maryland General Assembly be held in accordance with a court order adopting the * * * reapportionment plan [proposed by plaintiffs and attached to their complaint] or some other plan acceptable to the Court". Plaintiffs ask that a statutory three-judge court be convened.

Defendants have moved to dismiss on the grounds: (1) that the complaint raises no substantial federal question, because the present apportionment statute, Chapter 2 of the Laws of Maryland, 1965 Extraordinary Session, was expressly held to be constitutional in 1966 when measured by the prevailing constitutional standards adopted by the United States Supreme Court,[1] and that the controlling standards have not been altered since that time; (2) of res judicata or collateral estoppel, (3) of laches, and (4) because this Court would have to give the Maryland General Assembly an opportunity to adopt a constitutional plan, and that all necessary steps could

not practicably be completed before July 6, 1970, the final date for candidates to file for the September 15 primary and November 3 general elections.[2]

The single judge to whom the application for an injunction was presented must determine whether a substantial constitutional question is presented and whether the motion to dismiss should be granted before notifying the Chief Judge of the Circuit that a statutory three-judge court should be constituted. Jacobs v. Tawes, 250 F.2d 611, 614–615 (4 Cir. 1957). See also Britton v. Bullen, 275 F.Supp. 756, 760–761 (D.Md. 1967), mandamus denied, sub nom. Britton v. Thomsen, 390 U.S. 979, 88 S.Ct. 1110, 19 L.Ed.2d 1287 (1968); Rosso v. Com. of Puerto Rico, 226 F.Supp. 688 (D.P.R. 1964).

The four plaintiffs are residents of Maryland and registered voters.[3] They state that they also sue in behalf of all other voters eligible to participate in the 1970 elections who now reside in the counties of Prince George's, Montgomery and Anne Arundel, alleging that such voters constitute a class within the meaning of Rules 23(a) and 23(b) (3), F.R.Civ.P. The five State Senators from Prince George's County and the County Commissioners of that County have intervened as parties plaintiff.

The defendants are the Governor of Maryland, the members of the Board of State Canvassers[4] and the Board of Supervisors of Elections of Prince George's County. The Prince George's Board is alleged to be representative of a class consisting of the Boards of Supervisors of Elections of the 23 counties and of the City of Baltimore. All named defendants except the Prince George's

---

1. Hughes v. Maryland Committee for Fair Representation et al., 241 Md. 471, 217 A.2d 273 (1966), cert. den. 384 U.S. 950 86 S.Ct. 1569, 16 L.Ed.2d 547 (1966).

2. This suit was filed on April 6, 1970. A scheduling conference was held on April 13, to which members of the Democratic and Republican State Central Committees were invited and at which they were represented. Requests for leave to intervene

on one side or the other have been granted. Briefs have been filed, and oral argument was heard on April 24. The case was fully and ably argued on both sides.

3. The addresses given indicate that three of the four reside in Prince George's County, one in Anne Arundel County.

4. See Art. 33, § 18–1, Maryland Code (1957), 1969 Cum.Supp.

Board joined in the motion to dismiss, and the Mayor and City Council of Baltimore intervened as a party defendant, also moving to dismiss.

The long and stormy history of reapportionment in Maryland is summarized in Hughes v. Maryland Committee for Fair Representation, 241 Md. 471, 475–476, 217 A.2d 273, 275 (1966).[5] That history need not be retold here. Suffice it to say that in Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964), the Supreme Court reversed a decision of the Maryland Court of Appeals, 229 Md. 406, 184 A.2d 715 (1962), which had held valid the then existing Maryland legislative apportionment. The conclusion of the Supreme Court was based on the principles announced in Reynolds v. Sims, 377 U.S. 533, 84 S. Ct. 1362, 12 L.Ed.2d 506, decided the same day, June 15, 1964. The final paragraphs of the Supreme Court's opinion in the Maryland case read as follows:

"In view of the circumstances of this case, we feel it inappropriate to discuss remedial questions at the present time. Since all members of both houses of the Maryland General Assembly were elected in 1962, and since all Maryland legislators are elected to serve four-year terms, the next election of legislators in Maryland will not be conducted until 1966. Thus, sufficient time exists for the Maryland Legislature to enact legislation reapportioning seats in the General Assembly prior to the 1966 primary and general elections. With the Maryland constitutional provisions relating to legislative apportionment hereby held unconstitutional, the Maryland Legislature presumably has the inherent power to enact at least temporary reapportionment legislation pending adoption of state constitutional provisions relating to legislative apportionment which comport with federal constitutional requirements.

"Since primary responsibility for legislative apportionment rests with the legislature itself and since adequate time exists in which the Maryland General Assembly can act, the Maryland courts need feel obliged to take further affirmative action only if the legislature fails to enact a constitutionally valid state legislative apportionment scheme in a timely fashion after being afforded a further opportunity by the courts to do so. However, under no circumstances should the 1966 election of members of the Maryland Legislature be permitted to be conducted pursuant to the existing or any other unconstitutional plan. We therefore reverse the judgment of the Maryland Court of Appeals, and remand the case to that Court for further proceedings not inconsistent with the views stated here and in our opinion in Reynolds v. Sims." 377 U.S. at 675–676, 84 S.Ct. at 1440.

In compliance with the mandate from the Supreme Court, the Court of Appeals of Maryland remanded the case to the trial court with directions to retain jurisdiction and to take affirmative action upon application of any of the parties in the event that the Legislature failed to enact a constitutionally valid apportionment scheme prior to the 1966 primary elections.

At a special session of the Maryland Legislature in 1965 two bills, Senate Bills 5 and 8, were passed and signed by the Governor.[6]

---

5. That opinion refers in turn to 228 Md. 412, 180 A.2d 656 (1962), 229 Md. 406, 184 A.2d 715 (1962), and Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964), for a fuller statement of the history.

6. Senate Bill 8 contained an unusual provision stating that if it "be declared valid by the Court of Appeals of Maryland", then Senate Bill 5 "shall not become effective". The Governor signed both Bills, after publicly announcing that he thought Senate Bill 8 unconstitutional, but that the Legislature was entitled to have the Court of Appeals pass upon that question first, if the Legislature so desired.

The Maryland Courts held Senate Bill 8 unconstitutional, Hughes, supra, 241 Md. at 479–483, 217 A.2d at 277–279. But the Court of Appeals specifically held Senate Bill 5 constitutional, 241 Md. at 483–487, 217 A.2d 279–281, quoting at 241 Md. 477–479, 217 A.2d 275–276, the controlling principles stated in Reynolds v. Sims. Appendix 2 and Appendix 3 to the opinion of the Court of Appeals, 214 Md. at 489–490, 217 A.2d at 283–284, set out the reapportionment of the Senate and House of Delegates, respectively, called for by Senate Bill 5, which is now codified (with certain minor amendments in 1966) as Art. 40, §§ 42–42C, 46–47C, of the Maryland Code (1957), 1969 Cum.Supp. The statute provided for a reapportionment of the House of Delegates after each federal decennial census. The Supreme Court denied a petition for a writ of certiorari to review the decision of the Court of Appeals. Hughes v. Maryland Committee for Fair Representation, 384 U.S. 950, 86 S.Ct. 1569, 16 L.Ed.2d 547 (1966).

The apportionment approved by the Maryland Court, as shown by Appendix 2 and Appendix 3, 241 Md. at 489–490, 217 A.2d at 283–284, which will govern the 1970 elections, showed the greatest "% Variance—Unit of Population" based on the 160 census, for the Senate to be +18.2% for District No. 2 in Baltimore City (2 Senators), and −15.8% for the Counties of Cecil, Kent, Queen Anne's, Caroline and Talbot (collectively, 2 Senators) and for the House of Delegates to be +36% for Dorchester County (1 Delegate) and −28% for Calvert County (1 Delegate). The percentages for the Counties of Prince George's, Montgomery and Anne Arundel were −0.9%, +4.6% and +2.8% respectively for the Senate, and +2%, −2% and +5% respectively for the House.

By the Act of 1969, Ch. 785, the Maryland Legislature proposed the following amendments, inter alia, to Article III of the State Constitution, which will be voted upon at the November 1970 general election:

"Sec. 5. (Proposed Amendment)

"Following each decennial census of the United States, the Governor shall prepare a plan for legislative districting and apportionment. The Governor shall present the plan to the General Assembly not later than the first day of its regular session in the second year following the census, and may call a special session to present it prior thereto. No change in the number of members of the Senate or House of Delegates shall be provided in this plan. Following each decennial census the General Assembly shall by law enact a plan for legislative districting and apportionment. If no plan has been enacted for these purposes by the forty-fifth day after the opening of the regular session of the General Assembly of the second year following the census, the plan presented to the General Assembly by the Governor shall become law. Upon petition of any registered voter, the Court of Appeals shall have original jurisdiction to review the legislative districting and apportionment of the State and may grant appropriate relief, if it finds that the districting and apportioning of the State is not consistent with requirements of either the Constitution of the United States of America or the Constitution of Maryland."

"Sec. 6. (Proposed Amendment)

"A member of the General Assembly shall be elected by the registered voters of the legislative district from which he seeks election, to serve for a term of four years beginning on the second Wednesday of January following his election."

Plaintiffs contend that based upon the 1960 census figures, the present apportionment was unconstitutional in 1966 and is unconstitutional now by reason of changes in the law since 1966. They have also alleged that since 1960 the rapid growth of the four suburban counties, Baltimore, Anne Arundel, Prince George's and Montgomery, has resulted

in a gross malapportionment of most of the suburban areas, particularly Prince George's County. This allegation is based upon statistics compiled by the Department of Health and Mental Hygiene, Division of Statistics and Vital Records of the State, which prepare annual estimates of the population of each county and of Baltimore City, but not of areas within the counties or the City.[7] In Maryland Citizens Committee for Fair Congressional Redistricting, Inc. v. Tawes, 253 F.Supp. 731, 734 (D.Md. 1966), which dealt with Congressional reapportionment, a three-judge court, in an opinion by Judge Sobeloff, decided to use the 1960 census figures rather than various estimates which were submitted. The statistics prepared by the Department of Health and Mental Hygiene are probably more accurate, as far as they go, than the estimates submitted in the Congressional case, but they go only part of the way. This Court will consider the undisputed fact that Prince George's County is the most rapidly growing area in Maryland, but since plaintiffs base their argument primarily on a claimed change in the law since 1966, rather than upon changes in population, it is not necessary to decide at this time what figures should be used if a reapportionment is required.

(1), (2). In Reynolds v. Sims, the Court said, 377 U.S. at 583, 84 S.Ct. at 1392–1393:

"VIII. That the Equal Protection Clause requires that both houses of a state legislature be apportioned on a population basis does not mean that States cannot adopt some reasonable plan for periodic revision of their apportionment schemes. Decennial reapportionment appears to be a rational approach to readjustment of legislative representation in order to take into account population shifts and growth. Reallocation of legislative seats every 10 years coincides with the prescribed practice in 41 of the States, often honored more in the breach than the observance, however. Illustratively, the Alabama Constitution requires decennial reapportionment, yet the last reapportionment of the Alabama Legislature, when this suit was brought, was in 1901. Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system, although undoubtedly reapportioning no more frequently than every 10 years leads to some imbalance in the population of districts toward the end of the decennial period and also to the development of resistance to change on the part of some incumbent legislators. In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation. And we do not mean to intimate that more frequent reapportionment would not be constitutionally permissible or practicably desirable. But if reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect."

Plaintiffs concede that an increase in the population of certain areas cannot

---

7. Plaintiffs allege that the "statistics compiled by the Department of Health and Mental Hygiene take into account births, deaths, school enrollment, other migration factors, number of group living quarters, supplemented by data secured from the U. S. Department of Defense, the State Department of Corrections, the Maryland Department of Mental Hygiene and other sources." In preparing their proposed apportionment plan, plaintiffs have used these figures for the population of each county, but the breakdown into districts is based upon estimates prepared by other public bodies.

alone justify a ruling that the Fourteenth Amendment requires a reapportionment at this time after a valid ruling in 1966 that a statutory apportionment was valid.[8] But plaintiffs argue (a) that the decision of the Maryland Court in *Hughes* was wrong, and (b) that even if it was correct when rendered, there has been such a change in the law since that decision that it is no longer a bar to this action.

Defendants reply (a) that whether or not *Hughes* was properly decided, the passage quoted above from *Reynolds* and the principles of res judicata and collateral estoppel (as well as stare decisis), prevent this Court or any State Court from requiring a reapportionment until after the 1970 decennial census, and (b) that there has been no such change in the law since *Reynolds* and *Hughes* as would support plaintiffs' argument.

If it were not for the decision in *Hughes* and the passage quoted above from *Reynolds,* the allegations of the complaint would raise a substantial question whether the present apportionment of the Maryland Legislature meets the applicable standards.[9] But the present complaint and motion to dismiss must be considered in the light of *Reynolds* and of *Hughes.*

(a) Whether the decision in *Hughes* was right or wrong, it was a decision by a Court which had jurisdiction to make the decision, and the principle of stare decisis applies. All elements of res judicata are not present, but whether this suit is barred by the general principles of collateral estoppel is not clear. See Moore's Federal Practice, 2d ed., Vol. 1B, pp. 4231–4243, and Restatement, Judgments, § 70. That question, however, does not have to be decided in this case. Whether or not, without *Reynolds,* the present suit would be barred by collateral estoppel, it is clear, indeed it is not seriously disputed by plaintiffs, that in view of the passage from *Reynolds* quoted above, the present suit must be dismissed unless there has been a change in the law, i. e., a change in the controlling legal principles, since *Hughes* was decided by the Court of Appeals of Maryland.

(b) Plaintiffs have cited no case, and none has been found, in which a Court has held that there has been such a change in the law as would require it to set aside a plan of apportionment which was approved after *Reynolds* and the other decisions of the Supreme Court on June 15, 1964. The only case cited or found which deals with a similar question is Toombs v. Fortson, 275 F.Supp. 128 (N.D.Ga. 1966). In that case a three-judge court had approved in 1965 an interim plan for the reapportionment of the Georgia Senate which was accomplished in 1962 and the reapportionment of the Georgia House which was accomplished in 1965. The Court noted that the apportionment of both the House and Senate fell somewhat short of the federal constitutional one man-one vote standard. However, it was determined that a period of trial and study of the new apportionment system was indicated so as to provide a more useful instrument of government when the General Assembly was brought within constitutional standards. The Court required that reapportionment be completed by May 1, 1968 so as to apply to the 1968 elections.[10] Meanwhile, in 1966, the Supreme Court decided the Florida case of Swann v. Adams, 383 U.S. 210, 86 S.Ct.

---

8. As Judge Sobeloff, speaking for this Court, noted in Maryland Citizens Committee for Fair Congressional Redistricting v. Tawes, 253 F.Supp. 731 (1966), affirmed sub nom. Alton v. Tawes, 384 U.S. 315, 86 S.Ct. 1590, 16 L.Ed.2d 586 (1966), "Even if a district plan initially comports with the one-to-one formula, discrepancies may be expected to arise with changing conditions. Such discrepancies are unavoidable and must be tolerated for a time, till the next census, but in initial districting the aim should be to come as closely as possible to a one-to-one ratio." 253 F.Supp. at 733.

9. Whether the complaint would have to be dismissed on other grounds, e. g. laches, is another matter.

10. 241 F.Supp. 65; see 275 F.Supp. at 129.

767, 15 L.Ed.2d 707 (1966), and plaintiffs in the Georgia case sought an order requiring immediate reapportionment of the General Assembly of Georgia in the light of that opinion. The Georgia Court said:

"Thus a period of more than eleven months has elapsed since our last opinion and order without an appeal, a special election has taken place, and one regular session of the Assembly has been completed. However, this acquiescence in our previous order would be no bar to the further relief being sought if it should appear that the decision of the Supreme Court in Swann v. Adams, supra, is a binding precedent on this court, or even if it should appear to be a persuasive precedent. It is of paramount importance under our system of law that we be alert to follow Supreme Court decisions. On the other hand, our last opinion and order were entered only after full and complete hearings, and the order represented the considered judgment of the court in applying equitable principles to the question with respect to the individual federal constitutional rights involved and the legislative process of the State of Georgia.

"We are not inclined to grant the further relief now being sought unless substantial similarity should appear between the facts of this case and those of Swann v. Adams as that case was presented to the Supreme Court. We do not find such similarity as the following statements of facts will demonstrate. Nevertheless, further reflection has convinced us that our previous order should be modified

with respect to the time within which Georgia is required to enact a constitutional plan of apportionment into law." Toombs v. Fortson, 275 F. Supp. at 129.

The facts in the present case are also quite different from the facts in Swann v. Adams. That case did not involve an attempt to reopen a plan previously approved. On the other hand, in *Hughes* the Maryland Court found adequate reasons for the challenged variations and approved the plan, applying the principles prescribed by *Reynolds*.[11]

The cases cited by plaintiffs herein to support their argument that there has been a change in the law are not persuasive. They do show a progressive narrowing of the permissive variations, particularly in cases involving the reapportionment of Congressional districts, as distinguished from State legislatures.[12]

See, e. g., Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969); Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); Long v. Docking, 283 F.Supp. 539 (D. Kan.1968); Maryland Citizens Committee for Fair Congressional Redistricting v. Tawes, 253 F.Supp. 731 (1966). But none of the cases has repudiated the principles laid down in *Reynolds* and the other cases decided by the Supreme Court on June 15, 1964.

This Court finds that there has been no such change in the law as would require or justify a reapportionment by a federal court of the Maryland Legislature at this time,[13] in view of the pas-

---

11. After the remand in Swann v. Adams, another plan was adopted by the Florida legislature, which was also disapproved by the Supreme Court, Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). In the latter opinion the Court reiterated the principles stated in *Reynolds*, but held that no justification for the variations had been shown.

12. The differences between apportionments for Congressional and State legislative purposes were discussed at length in

Reynolds v. Sims, 377 U.S. at 578, 579, 84 S.Ct. 1362, 12 L.Ed.2d 506.

13. Whether or not the proposed amendments to the Maryland Constitution, discussed above, are approved by the voters in November 1970, the facts alleged in the complaint indicate that the Maryland Legislature will have to be reapportioned by the Legislature or the Governor or by some court, state or federal, before the next legislative election after November 1970.

sage quoted above from *Reynolds* and the decision of the Court of Appeals of Maryland in *Hughes*.

■ (3), (4). There is also merit in defendants' argument that the action is barred by laches. No reason appears why the complaint could not have been filed last year. The increase in the population of Prince George's County and the other suburban counties did not begin yesterday. Plaintiffs say that they filed the action "immediately following exhaustion by the Maryland General Assembly of its opportunity to reapportion". But if plaintiffs had filed their suit last year, and if the Court had found that reapportionment before the 1970 elections is required, the Court could have so ruled before the 1970 session of the Legislature, and could have given the Governor and the Legislature an opportunity to develop a plan deliberately. Plaintiffs say that "no prejudice is shown by the date of filing". But the prejudice to persons who wish to run for the Senate or the House is evident. They must know the boundaries of the district in which they live. Some have already filed, and others are completing their plans.

As the Court said in *Reynolds*:

"* * * Remedial techniques in this new and developing area of the law will probably often differ with the circumstances of the challenged apportionment and a variety of local conditions. It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree. * * *" 377 U. S. at 585, 84 S.Ct. at 1393–1394.

A fortiori, these principles should be applied in a case where the existing apportionment was approved by the Court of Appeals in 1966, and the State is taking appropriate steps to provide for a reapportionment after the 1970 census.

Defendants' motion to dismiss the complaint is hereby granted.