**Samuel SHAPIRO**

v.

**STATE OF MARYLAND.**

**Civ. No. 71–1280–M.**

United States District Court,
D. Maryland.

Jan. 19, 1972.

Leonard J. Kerpelman, Baltimore, Md., for plaintiff.

Francis B. Burch, Atty. Gen., of Maryland, and E. Stephen Derby, Asst. Atty. Gen., Baltimore, Md., for defendant.

JAMES R. MILLER, Jr., District Judge.

### Memorandum Opinion and Order

This action questions the constitutionality of the most recent restructure by the Maryland General Assembly of the eight United States Congressional Districts alloted to Maryland. Plaintiff, Samuel Shapiro, is a registered voter who formerly resided in the 7th Congressional District, but who, through a change in the boundary lines of the respective congressional districts through the legislative Act known as Chapter 353, Laws of Maryland (1971), has been placed in the 2nd Congressional District. Plaintiff's complaint alleges that the Maryland legislature engaged in "racial gerrymandering" by enacting Chapter 353 which amended Article 33 § 22–2 et seq., Annotated Code of Maryland (1971 Replacement Volume as amended). Plaintiff alleges a denial of equal protection of the laws under the 14th Amendment as well as a deprivation of his civil rights under 42 U.S.C. § 1983. He further alleges generally a violation of rights under the 15th Amendment. Since this action involves the constitutionality of a state statute together with a request for injunctive relief, the plaintiff has prayed the convening of a three-judge court under 28 U.S.C. § 2281 et seq. Plaintiff has prayed this court to declare Chapter 353 unconstitutional and has also prayed for an injunction to prevent an election being held until the 2nd and 7th Districts are properly reconstituted. The State of Maryland, the sole defendant, has moved to dismiss the suit.

■ A single district judge need not convene a three-judge court if the plaintiff's claim does not raise a substantial question. Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933); Maryland Citizens for a Representative General Assembly v. Governor of Md., 429 F.2d 606, 611 (4th Cir. 1970); Jacobs v. Tawes, 250 F.2d 611 (4th Cir. 1957); Lyons v. Davoren, 402 F.2d 890 (1st Cir. 1968), cert. den. 393 U.S. 1081, 89 S.Ct. 861, 21 L.Ed.2d 774 (1969); Britton v. Bullen, 275 F.Supp. 756 (D. Md. 1967). The claim of the plaintiff may be found to be insubstantial from a number of circumstances, such as the absence of federal jurisdiction, lack of standing of the plaintiff to sue, lack of substantive merit in the constitutional claim, or because injunctive relief is otherwise unavailable. Maryland Citizens for a Representative General Assembly v. Governor of Md., supra, 429 F.2d at 611 and cases therein cited; see also Hart v. Kennedy, 314 F.Supp. 823 (D. Okla. 1969); Cornwell v. State Board of Education, 314 F.Supp. 340 (D.Md. 1969), aff'd, 428 F.2d 471, cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970).

■ The instant suit is brought by a citizen of the State of Maryland against the State of Maryland. Normally such a suit is barred from the federal courts by the 11th Amendment to the United States Constitution unless the state has consented. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890) (interpreting the 11th Amendment as prohibiting a state from being sued by its own citizens). The state is not divested of its immunity "on the mere ground that the case is one arising under the Constitution or laws of the United States." Hans v. Louisiana, supra, 134 U.S., at 10, 10 S.Ct., at 505; see Duhne v. New Jersey, 251 U.S. 311, 40 S.Ct. 154, 64 L.Ed. 280 (1920); Parden v. Terminal R. Co., 377 U.S. 184 at 186, 84 S.Ct. 1207, 12 L.Ed. 2d 233 (1964). There is no indication here that the state has waived its sovereign immunity in this case.

■ While the state normally is immune from suit by one of its citizens in a federal court, its officials are not and they may be sued by private citizens to enjoin the denial of federal constitu-

tional rights. Ex parte Young, *supra;* see United States v. Mississippi, 380 U. S. 128 at 140, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965). Nor has congressional enactment granted authority in 42 U.S.C. § 1983, relied on by the plaintiff, for suit against the state since Maryland is a body politic and not a "person" amenable to suit under that section. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961). Counsel for the plaintiff, at oral argument on the motion to dismiss, conceded that the state had improperly been made the party defendant and requested leave to amend the complaint to name the proper party defendants. Since this court, as will appear later in this opinion, is of the view that this suit should be dismissed for other reasons, leave will not be granted to amend the complaint to substitute other defendants for the state.[1]

The defendant's motion also challenges the plaintiff's standing to sue. The complaint alleges that the 7th Congressional District had a racially balanced make-up of 50% white and 50% Negro prior to the passage of Chapter 353 which racially gerrymandered the district, changing its racial composition to 75% Negro and 25% white, in order "to deliver Congressman Parren Mitchell a safe seat" and "leave Congressman Paul Sarbanes out in the cold." Plaintiff further cryptically alleges that he is "either of the white or Negro race" and is bringing the suit both in his own behalf and as a class action on behalf of all those similarly situated.

A plaintiff to establish standing must allege first that the challenged action in fact causes him injury, whether economic or otherwise, and second that the interest which he seeks to protect is arguably within the zone of interests protected by the constitutional and statutory guarantees in question. Association of Data Processing Service v.

Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L. Ed.2d 184 (1970). While plaintiff has alleged that he formerly lived in a racially balanced 7th District, he has not alleged what the racial mix is in the new 2nd District where he now resides as a result of the changed boundary lines. If there is some constitutional right to live or vote in a racially balanced congressional district (which is doubtful), plaintiff has not alleged facts to show that his new district is not racially balanced. Hence, he does not allege that he has suffered in fact some injury under the first prong of the Association of Data Processing Service v. Camp test sufficient to give him standing to sue on the ground that he has been deprived of an alleged constitutional right to live or vote in a racially balanced congressional district.

If, on the other hand, plaintiff is complaining of constitutional wrongs allegedly done to persons who now live in the revised 7th District, he again fails to meet the first prong of the *Association of Data Processing Service v. Camp* test since he is not a resident of the revised 7th District. *Cf.* Chavis v. Whitcomb, 305 F.Supp. 1364, 1390 (S.D.Ind. 1969), rev'd on other grounds, Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).

In *Chavis,* plaintiffs claimed a denial of equal protection because Indiana's legislative districting included a multi-member district. Plaintiffs Chavis, Ramsey and Bryant alleged that the multi-member districting invidiously diluted the force and effect of the vote of Negroes and poor persons living within the ghetto area. The three-judge district court held that plaintiffs Chavis and Ramsey did not have standing because they did not show they were residents of the ghetto area and therefore they were not injured by the alleged underrepresentation. 305 F.Supp. at 1390.

1. Indeed it is doubtful that Rule 21, F.R. Civ.P. was intended to allow an amendment to a complaint to substitute entirely new defendants for the sole original defendant. Matsuoka v. United States, 28 F.R.D. 350 (D.Hawaii 1961); United States v. Swink, 41 F.Supp. 98 (E.D. Va.1941), but see Chagnon v. Griffiths, 17 F.R.D. 222 (D.Mass.1955); Moore's Federal Practice, 2nd Ed., Vol. 3A, Chap. 21–18—21–19.

The plaintiff before this court argues that his situation is closer to that of the plaintiffs in Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). However, in *Gomillion* the plaintiffs, who were all Negroes, were moved outside the city limits of Tuskegee, Alabama so that they could not vote in municipal elections. Here, plaintiff is not being deprived of his right to vote in the congressional elections; he is simply being told to vote in another district. If plaintiff has been injured by being forced into another district, he could conceivably have standing to question the entire redistricting scheme, but by failing to allege facts relating to the new 2nd District of which he is now a resident, it is impossible for this court to say that plaintiff has suffered any injury sufficient to give him standing to sue.

Further standing difficulties are created by plaintiff's allegation that he is " . . . either of the white or Negro race." Assuming that the legislature has indulged in racial gerrymandering in creating the new congressional districts by Chapter 353, the effect of the action applies only to the exercise of the electoral process. This court is not aware of any utility of congressional district lines other than to delineate the areas from within which a registered voter might vote for a candidate for the office of United States Representative and for a delegate or delegates to one of the national nominating conventions. Since the law relates only to the electoral or nominating process, one must look to that area to find the fruits or results, if any exist, of the alleged unconstitutional actions. The term "racial gerrymandering" obviously refers to the manipulation of district lines on the basis of the racial composition of the population in the geographical area under consideration. Logically, therefore, it would seem that the results or fruits of racial gerrymandering of a congressional district would or could result in diluting, minimizing or rendering ineffective the vote of members of a specified race or preventing a member of a specified race from gaining political office. See Gomillion v. Lightfoot, *supra*; Wright v. Rockefeller, 211 F.Supp. 460 (S.D.N.Y. 1962), aff'd 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964); Sims v. Baggett, 247 F.Supp. 96 (N.D.Ala.1965). The plaintiff here has alleged statistics bearing upon the racial composition as between whites and Negroes of the newly defined 7th Congressional District. Therefore, the unconstitutional fruits or results of the alleged racial gerrymandering must relate to the members of the white or the Negro race in that district. However, by describing himself as being "either of the white or Negro race," the plaintiff has failed to place himself in a category of persons to whom injury has occurred since it could not have occurred to both races in the context of the allegations in this complaint.

The plaintiff also alleges standing because he has been a candidate for Congress from the 7th District in the past and the redistricting reduces his expectations of success in the future. This point can be considered along with plaintiff's argument that the 7th District as formerly constituted was a racially balanced district and members of all races had a chance to win. Plaintiff complains of making the newly defined 7th District a "safe" seat for Congressman Parren Mitchell. Aside from the fact, as previously noted, that plaintiff has not alleged that the district in which he now resides is racially imbalanced or weighted in any way, this court does not find merit in the plaintiff's argument on this point. Plaintiff's point at oral argument, and as stated in his supplemental brief, is that he has a right to live in a racially balanced district, where the processes of democracy will give everyone an even chance of victory. This theory does not comport with the reasoning of the majority in Whitcomb v. Chavis, *supra*, 403 U.S. 153–155, 91 S.Ct. 1858. There, Mr. Justice White for the majority pointed out that the fact that minorities or interest groups in an elec-

toral unit find themselves consistently outvoted and without a person elected from their particular group is no basis for invoking constitutional remedies where there is no indication that the complaining minority or interest group has been denied access to the political system. In other words, the facts that so-called "safe" seats are created or that there are minorities created by the selection of the ultimate boundaries of the electoral unit do not, in themselves, constitute an unconstitutional deprivation of rights secured by the 14th and 15th Amendments. There is no allegation here that plaintiff is a member of any minority or interest group which has been denied access to the political system or that, in fact, there is any group which has been denied access to the political system by Chapter 353. There is no constitutional right to win elections, only the constitutional right to equal opportunity to participate in and influence the selection of candidates and office holders. As Mr. Justice White said in Whitcomb v. Chavis, *supra*, 403 U.S. at 153, 91 S.Ct. at 1874:

> "But we have not yet deemed it a denial of equal protection to deny legislative seats to losing candidates, even in those so-called 'safe' districts where the same party wins year after year."

Plaintiff's counsel strongly pleaded at oral argument that he should be allowed to amend his complaint to allege more facts to tend to establish plaintiff's right to live in a "balanced" district. In the view the court takes of this case, it is not necessary to consider plaintiff's request for leave to amend, but the court wishes to observe that no cause of action for racial gerrymandering can be made out unless there is an allegation and proof that the legislature's redistricting scheme, in so far as it affects the 7th and 2nd Districts, was motivated by racial considerations. It is not sufficient merely to show that the districts are not racially balanced. Wright v. Rockefeller, 376 U.S. 52, 56, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964).

The defendant has argued that this suit is barred by laches. Chapter 353, Laws of Maryland, 1971, around which this suit has centered, was signed by the Governor of Maryland on May 6, 1971, and became effective on July 1, 1971. This suit was instituted on November 18, 1971, requesting an injunction against the holding of any congressional elections until the 2nd and 7th Districts are reapportioned. Plaintiff has offered no explanation for the four and one-half month lapse between the effective date of the Act and the filing of this suit. This court is not prepared to find, as a matter of law, that the four and one-half month delay is an absolute bar to the maintenance of this suit, particularly in view of the fact that the districts created by Chapter 353 could reasonably be expected to continue in effect for at least ten years when the results of the 1980 census will probably require changes to be made due to population shifts. See Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

Even though it might not be proper to dismiss a suit on the ground of laches and thus forever bar an appropriate judicial inquiry into the merits of an otherwise properly alleged cause of action based on "racial gerrymandering" of congressional districts, the Supreme Court has recognized that in some cases the exigent circumstances might require the courts to withhold the relief requested. In Reynolds v. Sims, 377 U.S. 533, at page 585, 84 S.Ct. 1362, at page 1394, 12 L.Ed.2d 506 (1964), the Court said:

> " * * * [U]nder certain circumstances, *such as where an impending election is imminent and a State's election machinery is already in progress,* equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, *a court is entitled to and should consider the proximity of a forthcom-*

*ing election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.* With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." (Emphasis added).

The Presidential and Congressional elections will be held this year on November 7, 1972. Under Maryland law, Article 33, § 5–2, Anno.Code of Maryland (1971 Replacement Vol.), the primary election for presidential as well as congressional candidates will be held on May 16, 1972. The last day for filing a certificate of candidacy for any of these offices is 9 P.M. on Monday, March 6, 1972, less than nine weeks from the date the motion to dismiss was argued in this case. Article 33, § 4A–3, Anno.Code of Maryland (1971 Replacement Vol.).

██ Normally, before a court would itself undertake to draw district lines to bring them into conformity with constitutional standards, comity would require giving the state legislature a chance to remedy any wrongs that existed. Reynolds v. Sims, *supra,* at 586, 84 S.Ct. 1362. Here, however, if a three-judge court were to find that some or all of the congressional districts created by Chapter 353 suffer from fatal constitutional infirmities and were to enjoin the 1972 congressional elections until the Maryland General Assembly reconstituted the districts, it is almost inevitable that the primary election would have to be postponed, even assuming the General Assembly acted with all the speed it could muster.

██ In Pohoryles v. Mandel, 312 F. Supp. 334 (D.Md.1970), (aff'd, Maryland Citizens, *supra*), the time situation was very similar to the one facing this court. Judge Thomsen, of this bench, refused relief to plaintiffs who had filed their complaint on April 6, 1970, when

the final date candidates could file their certificates of candidacy was July 6, 1970, and the primary and general elections were to be held on September 15, 1970, and November 3, 1970, respectively. In *Pohoryles* there were 13 weeks between the date the complaint was filed and the date candidates had to file their certificates. In the present case there are 15 and one-half weeks separation, and presently less than eight weeks remain before the candidates' filing deadline. Under normal circumstances the primary in Maryland is held early in September and time for relief might exist, but this is a Presidential election year and the primaries are held on the third Tuesday in May. Article 33, § 5–2, Anno.Code of Maryland (1971 Replacement Vol.). This year a Presidential primary is being held in which certain of the delegates to the respective nominating conventions of the major political parties are elected by congressional district and, for the first time in Maryland, the delegates elected by congressional district are bound at the conventions (for two ballots, or until their candidate releases them, or until a candidate is nominated) to vote to nominate the Presidential candidate of their party who received the highest number of votes cast in the Presidential primary in their respective congressional districts. Article 33, § 12–1, Anno.Code of Maryland (1971 Replacement Vol.). This means Maryland's primary can be of great importance to Presidential candidates and redrawing of congressional districts could have an effect upon the Presidential nominations. Based on these facts, this court believes the injunctive relief requested is unavailable to the plaintiff because at this eleventh hour it would unduly disrupt the elective process and would seriously prejudice citizens, candidates, and government officials alike. Reynolds v. Sims, *supra,* 377 U.S. at 585, 84 S.Ct. 1362. See also, Dobson v. Mayor and City Council of Baltimore City, 330 F.Supp. 1290 (D. Md.1971); Wells v. Rockefeller, 394 U.S. 542, 547, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969).

In sum, this court believes the State of Maryland is not a proper party defendant. The plaintiff lacks standing to sue, at least under the allegations of the complaint as it now stands. The injunctive relief requested is not available at this time. For these reasons plaintiff's request for a three-judge court must be denied because the complaint does not allege a substantial federal question. If plaintiff or others wish to question the constitutional validity of any of the congressional districts created by Chapter 353, a new action can be filed requesting relief which will not interfere with the election machinery already in motion for the pending 1972 elections.

It is, therefore, this 19th day of January, 1972, by the United States District Court for the District of Maryland,

Ordered that plaintiff's request for a three-judge court must be, and it is hereby, denied; and it is further

Ordered that defendant's motion to dismiss the complaint must be, and it is hereby, granted; and it is further

Ordered that the complaint be, and it is hereby, dismissed without prejudice, with costs to defendant.